# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 19, 2022

Lyle W. Cayce
Clerk

No. 19-60273

Juan Carlos Ibarra-Avilez,

*Petitioner*,

*versus*

Merrick Garland, U.S. Attorney General,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals
BIA No. A201 178 008

Before Higginbotham, Stewart, and Wilson, *Circuit Judges*.
Per Curiam:*

Juan Carlos Ibarra-Avilez, a native and citizen of Mexico, entered the United States illegally in 1996. Fifteen years later, a Notice to Appear charged Ibarra with inadmissibility and commenced removal proceedings. An immigration judge (IJ) denied Ibarra's requests for asylum, withholding of removal, and protection under the Convention Against Torture (CAT).

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 19-60273

The Board of Immigration Appeals (BIA) dismissed Ibarra's appeal. Ibarra now petitions our court for review.

Ibarra contends: the BIA erred in determining the asylum application was untimely; the BIA failed to view Ibarra's adolescent mistreatment through the lens of a child and, for purposes of withholding of removal, record evidence compels the conclusion that there is a clear probability of persecution in Mexico; and the BIA misjudged the evidence supporting CAT protection. For the reasons discussed below, Ibarra's claims fail, and the petition is DISMISSED in part and DENIED in part.

## I.

Ibarra is a native and citizen of Mexico who was "born with the masculine gender" but now identifies "more in the feminine gender." Ibarra testified that beginning at a young age, students and classmates in Mexico (including parents of classmates) verbally harassed and physically assaulted Ibarra for more than a decade because of Ibarra's feminine behavior. These assaults resulted in bruises and headaches. No injuries were ever reported to the police because, according to Ibarra, the town was too small and lacked a police force.

In 1996, at the age of 18, Ibarra illegally entered the United States near El Paso, Texas. Shortly thereafter, Ibarra fully identified as a woman and began hormone therapy. Ibarra underwent breast augmentation surgery in 2016 and, according to the record, plans to pursue additional sexual-reassignment medical procedures in the future.

In 2011, Ibarra was served with a Notice to Appear and charged with removability under 8 U.S.C. § 1182(a)(6)(A)(i) of the Immigration and Nationality Act. Ibarra then submitted an application for asylum, withholding of removal, and relief under the CAT. The IJ held a hearing in 2016, at which Ibarra testified regarding the breast implants, childhood

No. 19-60273

abuse, and fear of "homophobic people" and the risk of violent harm if returned to Mexico. Ibarra called Dr. Thomas M. Davies as a witness with purported expertise on transgender asylum claims pertaining to Mexico. Davies testified that even though Mexico has enacted laws protecting transgender individuals, there remain significant risks for transgender persons in Mexico, and the Mexican police force is "one of the main perpetrators of violence" against the transgender community. Ibarra also submitted an "expert affidavit" from Dr. Nielan Barnes, which averred that transgender individuals in Mexico "cannot count on any civil or military official in local, state, or national governments for protection."

The IJ denied Ibarra's requested relief. The IJ concluded: Ibarra's asylum application was untimely, and the 2016 breast augmentation surgery did not constitute a "changed circumstance" excusing the delay; Ibarra did not substantiate past persecution or a well-founded fear of future persecution for the purposes of withholding of removal; and CAT relief was unwarranted because the evidence did not establish it was more likely than not Ibarra would be tortured if returned to Mexico. The IJ also declined to consider Dr. Davies an expert witness and assigned his testimony "limited weight" because of his lack of relevant qualifications or specialized knowledge.[1] The IJ did not discuss Dr. Barnes's affidavit, let alone determine whether Barnes

---

[1] Ibarra challenged this determination before the BIA, which agreed with the IJ's assessment of Dr. Davies's testimony and similarly gave limited weight to his statements. Ibarra does not raise or brief any objection to the BIA's determination, therefore abandoning the issue. *See Soadjede v. Ashcroft*, 324 F.3d 830, 833 (5th Cir. 2003).

was an expert.[2]  The BIA agreed with the IJ on each issue and dismissed Ibarra's appeal.  Ibarra timely filed this petition for review.

## II.

On review, we consider only the BIA's opinion, "unless the IJ's decision has some impact on the BIA's decision."  *Orellana-Monson v. Holder*, 685 F.3d 511, 517 (5th Cir. 2012) (citation omitted).  Where, as here, the BIA adopts much of the IJ's reasoning, we also review the relevant portions of the IJ's decision.  *See, e.g.*, *Zhu v. Gonzales*, 493 F.3d 588, 593 (5th Cir. 2007).  We review legal determinations de novo and factual findings for substantial evidence.  *Orellana-Monson*, 685 F.3d at 517–18.

Under the substantial evidence standard, "reversal is improper unless we decide not only that the evidence supports a contrary conclusion, but also that the evidence *compels* it."  *Chen v. Gonzales*, 470 F.3d 1131, 1134 (5th Cir. 2006) (internal quotation marks and citation omitted); *accord Santos-Zacaria v. Garland*, --- F.4th ----, ----, No. 19-60355, 2022 WL 91659, at *1 (5th Cir. January 10, 2022).  That is, the record evidence must be "so compelling that no reasonable fact finder could fail to find" that the petitioner is eligible for the requested relief.  *Eduard v. Ashcroft*, 379 F.3d 182, 186 (5th Cir. 2004) (citation omitted).  The petitioner bears the burden of showing the evidence compels reversal.  *Chen*, 470 F.3d at 1134.

---

[2] On appeal to the BIA, Ibarra objected to the IJ's exclusion of Dr. Barnes's testimony, but the BIA likewise did not mention the affidavit.  Ibarra did not brief the issue on appeal, such that the issue is abandoned.  We only note that other courts have recognized Dr. Barnes as an expert.  *See, e.g.*, *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1081–82 (9th Cir. 2015).

## III.

The BIA affirmed the IJ's determination that Ibarra's asylum application was untimely and did not warrant an exception for changed circumstances. It then denied Ibarra's request for withholding of removal and found that, even if Ibarra's asylum application was timely, it would fail for the same reasons as did Ibarra's request for withholding of removal. Lastly, it denied Ibarra's request for CAT relief. Because the BIA evaluated Mexico's country conditions and other evidence offered by Ibarra in the context of withholding of removal, we first address that claim before considering Ibarra's application for asylum.[3] We conclude with Ibarra's claim under the CAT.

## A.

To qualify for withholding of removal, an alien must demonstrate a "clear probability" of persecution on the basis of race, religion, nationality, membership in a particular social group, or political opinion. *Zhang v. Gonzales*, 432 F.3d 339, 344 (5th Cir. 2005) (citing *Faddoul v. I.N.S.*, 37 F.3d 185, 188 (5th Cir. 1994)). Persecution is defined, in relevant part, as the infliction or suffering of harm "under government sanction" or by "groups the government is unable or unwilling to control." *See Chen*, 470 F.3d at 1135 (citation omitted); *Adebisi v. I.N.S.*, 952 F.2d 910, 914 (5th Cir. 1992)

---

[3] Ordinarily, a denial of asylum necessitates a denial of withholding of removal. *See, e.g.*, *Majd v. Gonzales*, 446 F.3d 590, 595 (5th Cir. 2006) ("Because the level of proof required to establish eligibility for withholding of removal is higher than that required for asylum, failure to establish eligibility for asylum is dispositive of claims for withholding of removal."). The reverse is not necessarily the case. Here, the BIA determined Ibarra's asylum application was untimely and then focused its substantive analysis on Ibarra's withholding of removal claim. But the BIA concluded that both claims suffered the same dispositive evidentiary deficiencies, irrespective of the lower burden of proof as to asylum claims. We can thus logically take these claims out of order and begin our discussion with withholding of removal.

(internal quotation marks omitted). If an alien establishes past persecution based on membership in one of the five categories, the burden shifts to the Government to establish the threat no longer exists or can be mitigated through relocation within the country. 8 C.F.R. § 1208.16(b)(1). If there is no showing of past persecution, an alien must demonstrate that he or she will "more likely than not" suffer persecution upon return. *Id.* § 1208.16(b)(2). Here, there is no dispute that Ibarra is a member of a cognizable particular social group: male to female transgender persons. Our focus is therefore on Ibarra's ability to establish past or future persecution.

The BIA found the mistreatment Ibarra previously endured in Mexico did not rise to the level of harm required for past persecution. On appeal, Ibarra contends the BIA erred in not applying a "childhood standard" in assessing Ibarra's abuse as an adolescent. This argument, though, was never presented to the BIA. This claim is accordingly unexhausted, and we lack jurisdiction to hear it. *See Wang v. Ashcroft*, 260 F.3d 448, 452–53 (5th Cir. 2001) (noting that a petitioner fails to exhaust administrative remedies with respect to an issue "when the issue is not raised in the first instance before the BIA"). Ibarra does not challenge any other aspect of the BIA's past-persecution finding. Thus, lacking a showing of past persecution, Ibarra must demonstrate that the evidence compels the conclusion that it is more likely than not Ibarra will suffer future persecution upon return to Mexico. *See* § 1208.16(b)(2).

The BIA affirmed the IJ's determination that Ibarra will not face future persecution in Mexico because any harm Ibarra fears will not be perpetuated by the Mexican government and because Ibarra could reasonably relocate to Mexico City to avoid danger. In reaching its conclusion, the BIA surveyed various laws enacted by the Mexican government meant to protect transgender persons. The BIA evaluated these provisions against evidence of violence directed at transgender individuals and a broader backlash

towards pro-LGBTI[4] legislation.  Ibarra asserts the BIA misjudged the record and, considered properly, the evidence overwhelmingly compels the conclusion there is a clear probability of persecution in Mexico.

The record evidence is multitudinous.  On the one hand, the record contains studies on which Ibarra primarily relies—country reports, university-sponsored reports, and data detailed in Dr. Barnes's affidavit.  This evidence indicates that transgender persons face "pervasive persecution" in Mexico, violence against LGBTI people has recently increased in Mexico City, discrimination and hate crimes on the basis of sexual orientation and gender identity "remain all too common," Mexican police have "routinely" subjected LGBTI persons to mistreatment while in custody, homicides of transgender persons "tend to result in impunity," and aspects of Mexican police and military subculture are "imbued with homophobic and anti-gay elements."[5]

On the other, the record indicates that the Mexican government has evinced a commitment to the protection and legal recognition of transgender individuals.  The government's actions include enacting laws prohibiting discrimination against transgender persons, allocating special prison quarters for transgender prisoners, allowing transgender persons to change their names and gender markers on their birth certificates in Mexico City, creating a specialized unit in the Mexican Attorney General's office tasked with

---

[4] "LGBTI" stands for lesbian, gay, bisexual, transgender, and intersex; it is the initialism used by the U.S. Department of State's 2015 Human Rights Report on Mexico in the context of the record in this case, *see infra*, so we likewise use it for consistency.

[5] We recognize that the initialism "LGBTI" is broader than Ibarra's particular social group, male to female transgender persons.  As discussed above the line, some of the evidence offered by Ibarra addresses Mexico's treatment of the LGBTI population, while other evidence is tailored to transgender persons.  We employ the terminology used in the referenced evidence, as it appears in the record and as it was offered.

assisting LGBTI crime victims, and providing victims of sexual discrimination an avenue to file complaints through the government's National Council to Prevent Discrimination. Further, the mayor of Mexico City has declared the Federal District to be an "LGBTI-friendly" city,[6] and a government-run community center has been established in Mexico City to provide medical, legal, and psychological assistance to transgender persons.

Plainly, the record evidence is mixed. Given that fact, Ibarra's proffered studies cannot clear the "deferential standard" of substantial evidence review. *See Silwany-Rodriguez v. I.N.S.*, 975 F.2d 1157, 1160 (5th Cir. 1992); *see also Revencu v. Sessions*, 895 F.3d 396, 401 (5th Cir. 2018) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." (citation omitted)); *Kane v. Holder*, 581 F.3d 231, 236 (5th Cir. 2009) ("We may not reverse [under substantial evidence review] merely because we would have decided the case differently." (citation omitted)). Considering the record, particularly the myriad legal enactments protecting transgender persons, we cannot conclude that the evidence *compels* a determination that the Mexican government is sanctioning violence against the transgender community or, relatedly, that groups the government is unable or unwilling to control are perpetrating such violence. Moreover, Mexico City clearly affords transgender persons more legal protections and resources than other parts of the country do, and Ibarra has not shown why relocation within Mexico would be unreasonable. *See Santos-Zacaria*, --- F.4th ----, ----, 2022 WL 91659, at *2–3.

Without the Mexican government's sanction of violence, Ibarra cannot show a clear probability of persecution upon returning to Mexico. *See*

---

[6] Before 2016, the Federal District was the same as Mexico City.

*Shehu v. Gonzales*, 443 F.3d 435, 438 (5th Cir. 2006) ("Although the violence against [persons similar to petitioner] is unfortunate, there is no 'persecution' absent proof that the violence is condoned or orchestrated by the current . . . government."); *Adebisi*, 952 F.2d at 914 (affirming the denial of asylum because "[t]he evidence in the record supports the [BIA's] finding that the persecution feared by [petitioner] does not arise from activities instigated or sanctioned by the . . . government, authorities, military, or supporters of the regime") (internal quotation marks omitted). Accordingly, substantial evidence supports the BIA's conclusion that withholding of removal was not warranted.

## B.

We need not address Ibarra's objections regarding the asylum application's timeliness. *See* 8 U.S.C. § 1158(a)(2)(B) (requiring that an alien submit an asylum application within one year of entering the United States). The BIA explained that, even if the application was timely, it would have been denied for the same substantive reasons as withholding of removal. We agree with the BIA's rationale.

The BIA's conclusion that Ibarra cannot show that the alleged harms to transgender persons would be sanctioned by the Mexican government— i.e., that Ibarra cannot show "persecution"—equally applies to bar the asylum claim here because both withholding of removal and asylum claims are grounded on the same definition of "persecution." *See Adebisi*, 952 F.2d at 913–14. Because substantial evidence supports the BIA's denial of withholding of removal, it also supports the BIA's alternative basis for denying asylum on the same reasoning.

## C.

To be eligible for deferral of removal under the CAT, an alien must show it is more likely than not that the alien will be tortured upon removal.

*E.g.*, *Majd*, 446 F.3d at 595.  Torture is defined as "any act by which severe pain or suffering . . . is intentionally inflicted on a person . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official."   8 C.F.R. § 208.18(a)(1).   Relief thus "requires a two part analysis—first, is it more likely than not that the alien will be tortured upon return . . . ; and second, is there sufficient state action involved in that torture." *Garcia v. Holder*, 756 F.3d 885, 891 (5th Cir. 2014). In assessing whether an applicant will be tortured, we look for record evidence of past torture, the possibility of relocation within the country, and flagrant human rights violations. *Martinez Manzanares v. Barr*, 925 F.3d 222, 228 (5th Cir. 2019); 8 C.F.R. § 208.16(c)(3).  To show acquiescence, an applicant must demonstrate the government is willfully blind of the torturous activity.  *Martinez-Lopez v. Barr*, 943 F.3d 766, 772 (5th Cir. 2019).

The BIA agreed with the IJ's findings that neither the Mexican government nor private individuals had tortured Ibarra in the past, there was insufficient evidence the Mexican government would acquiesce to torture in the future, and Ibarra could reasonably relocate within Mexico.  The BIA thereby affirmed the denial of CAT relief.  Ibarra's objections are similar to those leveled at the denial of withholding of removal.  Namely, Ibarra contends that the BIA erred in failing to view Ibarra's childhood mistreatment through the lens of a child, and that the BIA's determination that Ibarra would not be tortured is contrary to evidence of violence against transgender persons throughout Mexico.

We lack jurisdiction to consider Ibarra's first objection because it was not presented to the BIA.  *See Wang*, 260 F.3d at 452–53.  Ibarra's second contention fails for the same reasons as Ibarra's requests for withholding of removal and asylum:   the record evidence does not show the Mexican government's acquiescence in the torture of transgender persons, and Ibarra has not demonstrated that relocation would be unreasonable.  *See Qorane v.*

*Barr*, 919 F.3d 904, 911 (5th Cir. 2019) ("[T]he incidents specific to [petitioner] discussed above do not even rise to the level of persecution. It follows *a fortiori* they do not constitute torture."); *Dayo v. Holder*, 687 F.3d 653, 659 (5th Cir. 2012) (noting that lack of evidence in support of petitioner's asylum and withholding of removal claims likewise barred CAT relief).

More specifically, while there is record evidence of violent crime and corruption targeting transgender individuals in Mexico, such evidence does not entail government acquiescence—particularly given the Mexican government's various efforts meant to curb such violence. *Cf. Tabora Gutierrez v. Garland*, 12 F.4th 496, (5th Cir. 2021) (finding that "evidence does not compel the conclusion that . . . torture will occur with the consent or acquiescence of Honduran officials[,]" despite demonstrating that "thanks in part to MS-13, Honduras has become one of the most violent countries on the planet that is not at war") (internal quotations omitted); *Martinez-Lopez*, 943 F.3d at 772 (denying CAT protection because "although the record contains reports of some Honduran authorities working with gangs, those same reports indicate that the Honduran government is working to combat both corruption and gang violence"); *see Qorane*, 919 F.3d at 911 ("[A] government's inability to protect its citizens does not amount to acquiescence."); *Tamara-Gomez v. Gonzales*, 447 F.3d 343, 351 (5th Cir. 2006) (finding "neither the failure to apprehend the persons threatening the alien, nor the lack of financial resources to eradicate the threat or risk of torture constitute sufficient state action for [CAT] purposes"). The BIA's denial of CAT protection was supported by substantial evidence.

## IV.

We DISMISS Ibarra's contentions regarding a childhood standard for assessing past persecution for withholding of removal and torture under

No. 19-60273

the CAT because we lack jurisdiction over those claims.  We DENY the petition for review as to all remaining issues.

PETITION DISMISSED in part; DENIED in part.

No. 19-60273

PATRICK E. HIGGINBOTHAM, *Circuit Judge*, concurring:

We will only reverse the BIA's decision if "the evidence compels it"[1] and given this Court's affirmance of the BIA's dismissal in similarly situated cases,[2] I concur. I write to shine a small light on the present realities, in hopes it may reach the desk of the beleaguered IJs and their review.

The panel decision relies heavily on the formal steps that Mexico and Mexico City have taken recently to extend legal protections to transgender people,[3] passing by the overwhelming evidence that violence against transgender women in Mexico has increased in recent years.

It accents aspirational changes that have not materialized on the ground in Mexico—even in Mexico City. The record is replete with evidence of the persecution of transgender people in Mexico that postdate the country's purported legal improvements. "[R]ates of violence and murder have actually *increased* in Mexico City" and "Mexico City has the highest rate of transphobic murders in the country."[4] "Reports of hate crimes—particularly transphobic murders—continue to rise, including in Mexico City."

Ibarra-Aviles entered into the record numerous reports detailing the violence that the transgender community continues to face in Mexico. A

---

[1] *Chen v. Gonzales*, 470 F.3d 1131, 1134 (5th Cir. 2006).

[2] *E.g.*, *Santos-Zacaria v. Garland*, No. 19-60355, 2022 WL 91659, at *2 (5th Cir. Jan. 10, 2022).

[3] Op. at 6–8; *see Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1072 (9th Cir. 2017) (finding that Mexico's "de jure commitments to LGBTI protection do not align with the de facto reality of whether the State is able and willing to provide protection").

[4] For example, there were at least 8 murders of transgender women in Mexico City between 2012–2013, in 2012 a transgender woman was dismembered, in 2013 the transgender woman who led the Special Unit on LGBT Issues in the Attorney General's office was murdered, and during the 2014 Mexico City Pride March a transgender woman was accosted and dragged down the road.

report from the Transgender Law Center notes that "[d]espite recent legal reforms in Mexico, . . . rates of violence against transgender women are higher than ever" because "LGBT communities [are now] more visible to the public." And a Report on Human Rights Conditions of Transgender Women explains that police in Mexico are often the perpetrators of violence against transgender women. Additionally, "homicides of transgendered women tend to result in impunity." Between 2010 and 2012 there were 126 reported murders of transgender women.[5] And a report by the Center for International Human Rights found that Mexico has "fallen short of its obligation to respect and ensure all [International Covenant on Civil and Political Rights] rights to all individuals, including LGBTI individuals." To these eyes, Carolina Ibarra-Aviles will face a dangerous situation upon her return to Mexico.

Yet, as the opinion details, Mexico has enacted numerous legal protections for transgender people[6] and with the high bar for reversal,[7] I concur in its judgment.

---

[5] The report notes that this number likely underestimates the true number of transgender women murdered during this period.

[6] *See* Op. at 7–8.

[7] *See Santos-Zacaria*, No. 19-60355 at 2; *Shehu v. Gonzales*, 443 F.3d 435, 438 (5th Cir. 2006); *Chen v. Gonzales*, 470 F.3d 1131, 1137 (5th Cir. 2006).