United States Court of Appeals
Fifth Circuit

**F I L E D**

**November 22, 2006**

Charles R. Fulbruge III
Clerk

REVISED DECEMBER 21, 2006
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 05-60379

---

XUE ZHEN CHEN

　　　　　　　Petitioner

　　v.

ALBERTO R. GONZALES, U S ATTORNEY GENERAL

　　　　　　　Respondent

---

Petition for Review of an Order of the
Board of Immigration Appeals
BIA No. A77 977 370

---

Before KING, GARWOOD, and JOLLY, Circuit Judges.

KING, Circuit Judge:

　　Xue Zhen Chen petitions for review of an order of the Board of Immigration Appeals denying her application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture.

## I. FACTUAL AND PROCEDURAL BACKGROUND

　　Petitioner Xue Zhen Chen is a native and citizen of China, where she was born and lived in the Fujian Province.  In August 2001, Chen left China illegally and entered the United States with the paid assistance of smugglers, known as "snakeheads." Upon arriving at the Los Angeles International Airport from Vietnam, Chen presented a United States passport issued to Jenny Susan Chong.  Immigration officials determined Chen's true

identity and she was subsequently charged as being subject to removal on grounds that she falsely represented that she was a United States citizen and she did not have any documentation authorizing her presence in the United States.

Chen conceded removability in removal proceedings, but applied for asylum, withholding of removal, and for protection under the United Nations Convention Against Torture ("Convention Against Torture") on April 30, 2002.  Chen asserted in her application that she could not return to China because: (1) she feared physical harm from snakeheads and money lenders as retribution for the debt she owed them; (2) local officials were corrupt and profited from illegal smuggling operations and therefore would not protect her from snakeheads and money lenders; (3) her mother was forcibly sterilized and Chen disagreed with China's coercive family planning policy; and (4) she would be jailed because she left China illegally, and once jailed, would be subject to mental and physical torture.

In the two-year intervening period between Chen's application for relief and her removal hearing, Chen lived in Mount Pleasant, Texas, and worked at her uncle's restaurant. While working at the restaurant, Chen became acquainted with members of a nearby Nazarene church who offered to help her improve her English.  Chen began taking English lessons at the church, became interested in Christianity, and then took Bible classes and was baptized at the church.  At her removal hearing before the immigration judge ("IJ") on March 29, 2004, Chen stated, as part of her argument for relief, that she had

converted to Christianity since her arrival in the United States and that she feared persecution on the basis of religion if she returned to China.

The IJ issued an oral decision and accepted Chen's testimony as "basically plausible and credible." The IJ, however, denied Chen's application on all three bases for relief. The IJ concluded that if Chen were to be jailed as a result of her illegal departure from China, the evidence did not support a reasonable fear of harm constituting persecution or a likelihood of torture. The IJ likewise concluded that it was unlikely that snakeheads or money lenders would cause any harm to Chen, and that based on the evidence of the Chinese government's "substantial effort" to detect, arrest, and prosecute corrupt public officials, it was unlikely that the government of China would acquiesce in any harm from snakeheads or money lenders. The IJ further concluded that the substantial period between Chen's mother's forced sterilization, the lack of evidence about Chen's interest in motherhood, and the government's declining efforts to enforce the one-child policy barred relief on the basis of China's family policy. Finally, the IJ concluded that the evidence did not show that it was likely that Chen would suffer harm amounting to persecution on the basis of her conversion to Christianity.

The Board of Immigration Appeals ("BIA") affirmed the IJ's decision without an opinion and Chen timely appealed.

## II. STANDARD OF REVIEW

When the BIA affirms the IJ's decision without an opinion,

as is the case here, the IJ's decision is the final agency decision for purposes of judicial review on appeal. Soadjede v. Ashcroft, 324 F.3d 830, 831-32 (5th Cir. 2003). The agency's administrative "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary . . . ." 8 U.S.C. § 1252(b)(4)(B). This standard of review essentially codifies the substantial evidence test established by the Supreme Court in INS v. Elias-Zacarias, 502 U.S. 478, 481 & n.1 (1992). We apply this standard in reviewing an IJ's factual conclusion that an applicant is not eligible for asylum, Zhao v. Gonzales, 404 F.3d 295, 306 (5th Cir. 2005), withholding of removal, Zamora-Morel v. INS, 905 F.2d 833, 838 (5th Cir. 1990), and relief under the Convention Against Torture, Ontunez-Tursios v. Ashcroft, 303 F.3d 341, 353 (5th Cir. 2002).

Under the substantial evidence standard, reversal is improper unless we decide "not only that the evidence supports a contrary conclusion, but also that the evidence compels it." Zhao, 404 F.3d at 306 (quoting Chun v. INS, 40 F.3d 76, 78 (5th Cir. 1994)). The applicant has the burden of showing that the evidence is so compelling that no reasonable factfinder could reach a contrary conclusion. Id.

## III. DISCUSSION

Chen contends that the IJ erred by denying her application for asylum, withholding of removal, and relief under the Convention Against Torture. We review her claims of error according to each basis for relief.

**A.   Asylum**

The Attorney General has the authority to grant asylum to any applicant who qualifies as a refugee under 8 U.S.C. § 1101(a)(42)(A). 8 U.S.C. § 1158(b). The statute defines a refugee as

> any person . . . who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

8 U.S.C. § 1101(a)(42)(A). Being classified as a refugee on the basis of past persecution or a well-founded fear of persecution, however, does not automatically entitle a refugee to asylum. Mikhael v. INS, 115 F.3d 299, 303 (5th Cir. 1997). The Attorney General's statutory power to grant asylum is discretionary. Id. (noting that the provision's language is precatory, giving the Attorney General discretion to grant asylum).

Because Chen converted to Christianity after her arrival in the United States, her asylum application rests on a well-founded fear of persecution based on religion rather than past persecution. To establish a well-founded fear of future persecution, an applicant must demonstrate "a subjective fear of persecution, and that fear must be objectively reasonable." Eduard v. Ashcroft, 379 F.3d 182, 189 (5th Cir. 2004) (quoting Lopez-Gomez v. Ashcroft, 263 F.3d 442, 445 (5th Cir. 2001)). Because the IJ credited Chen's testimony, her subjective fear of persecution is not at issue and our review focuses on the objective reasonableness of her fear. The objective prong requires the applicant to establish that "'a reasonable person in

[her] circumstances would fear persecution'" if deported.  Id.

(quoting Faddoul v. INS, 37 F.3d 185, 188 (5th Cir. 1994)).

Although the Immigration and Nationality Act does not define

"persecution," we have relied on a description of persecution as:

> The infliction or suffering of harm, under government sanction, upon persons who differ in a way regarded as offensive (e.g., race, religion, political opinion, etc.), in a manner condemned by civilized governments. The harm or suffering need not be physical, but may take other forms, such as the deliberate imposition of severe economic disadvantage, or the deprivation of liberty, food, housing, employment, or other essentials of life.

Abdel-Masieh v. INS, 73 F.3d 579, 583 (5th Cir. 1996) (quoting

Matter of Laipenieks, 18 I. & N. Dec. 433, 456-57 (BIA 1983)).

The well-founded fear standard does not require an applicant to

demonstrate that he will be persecuted if returned to his native

country, but rather, requires that he establish persecution as a

"reasonable possibility."  INS v. Cardoza-Fonseca, 480 U.S. 421,

440 (1987); see also Eduard, 379 F.3d at 189 (relying on Cardoza-

Fonseca for the proposition that the applicant must establish,

"to a reasonable degree," that return to his native country would

be intolerable).

To establish the objective reasonableness of a well-founded

fear of persecution, an applicant must prove that

> (1) he possesses a belief or characteristic a persecutor seeks to overcome by means of punishment of some sort; (2) the persecutor is already aware, or could become aware, that the alien possesses this belief or characteristic; (3) the persecutor has the capability of punishing the alien; and, (4) the persecutor has the inclination to punish the alien.

Zhoa, 404 F.3d at 307 (citing Eduard, 379 F.3d at 191).

Chen asserts that the IJ erred by holding that she did not have a well-founded fear of persecution based on her religion. She argues that the IJ's conclusion that her fear of persecution was not objectively reasonable was based on two erroneous assumptions: that Chen's Nazarene faith was not at a level of sophistication such that she would be subjected to persecution and that only a small percentage of Christians are persecuted in China.

Chen first argues that the IJ erred in relying on her "level of [religious] sophistication" to determine whether she would be subjected to persecution because an applicant's level of sophistication cannot be used as a proxy for depth of religious faith. Chen points to the Second Circuit's recent decision in Rizal v. Gonzales, 442 F.3d 84 (2d Cir. 2006), for support. In Rizal, the Second Circuit granted an applicant's petition for review because the IJ "erroneously viewed [the applicant's] lack of detailed doctrinal knowledge about Christianity as automatically rendering incredible his claim of religious persecution, without assessing the genuineness of [his] asserted Christian self-identification . . . ." Id. at 86. Rizal, however, does not resolve the dispositive question presented here. Whereas in Rizal, the IJ posed doctrinal questions to determine that the applicant's testimony regarding his religious belief was not credible, in Chen's case, the IJ accepted Chen's testimony of religious conversion as credible based on her demeanor and documents demonstrating that she had completed Bible classes and had been baptized. Although the IJ did refer to

Chen's level of sophistication, it was in relation to whether Chen's understanding of doctrinal distinctions was at a stage such that, if returned to China, she would have to attend a Nazarene church in particular, which would necessarily be an unregistered or underground church, or if she could attend the state-sponsored Protestant church.[1]  Chen counters that she would not attend a state-sponsored church and would be relegated by both choice and geographical logistics in the Fujian Province to attend an unregistered or underground church.

Chen's argument for asylum then actually rests on the persecution to which adherents in unregistered or underground churches are subjected.  Accordingly, although we do not agree with Chen that the IJ improperly considered level of sophistication in her case, the success of her claim rests not on her first claim of error——the sophistication of her beliefs——but on her second claim, which is that the judge erred in concluding that Protestants worshiping in either registered or unregistered churches in China are not subject to persecution to the extent necessary to give rise to a well-founded fear of persecution.

We consider it unnecessary to resolve the debate about which church Chen would attend because the evidence does not compel a finding of persecution in either case.  The IJ found that based on the evidence in

> the country materials and the Religious

---

[1]     The IJ stated: "[T]he respondent at this point, I take her at her word, has converted to Christianity, but the Court doesn't think that her level of sophistication in this regard is such that she would feel it necessary to try to find a Nazarene church as compared with some other Protestant church."

Freedom Report that there are many Christians in China and many of them are members of registered churches who don't have any particular problems. And to the extent that those who are members of these unregistered churches, again, it would seem[] to the Court that it's really a relatively small number or percentage of people who suffer any harm on that account.

Consequently, the IJ found Chen's fear of persecution to be "highly speculative."

Chen points to the China Country Report on Human Rights Practices——2002 ("2002 Country Reports") as compelling the opposite conclusion. Our review of the entire record, including the China 2003 International Religious Freedom Report ("2003 Religious Freedom Report") and the 2002 Country Report, however, does not compel the conclusion that Chen faces persecution to a reasonable degree. Although the 2003 Religious Freedom Report is troubling in indicating that the Chinese government's "respect for freedom of religion . . . remains poor"[2] and that unregistered religious groups continued to experience "varying degrees of official interference and harassment,"[3] the report is not sufficiently detailed to support conduct amounting to a pattern of persecution directed at Protestants. Cf. Eduard, 379 F.3d at 192 & n.10. The 2003 Religious Freedom Report is generally vague and its examples tend to focus on official repression of non-Protestant groups.[4] The same report also

---

[2] R. 232, 2003 Religious Freedom Report.

[3] R. 232, 2003 Religious Freedom Report.

[4] R. 232, 2003 Religious Freedom Report ("The Government's respect for religious freedom . . . remained poor, especially for some members of unregistered religious groups and

states that the number of religious adherents at official <u>and</u> underground places of worship continued to grow in China,[5] and that "many religious adherents reported that they are able to practice their faith in officially registered places of worship . . . without interference."[6]  As for underground adherents, the report indicates that although there is governmental pressure for unregistered churches to register, and notwithstanding the fact that police closed "<u>some</u> Catholic churches and Protestant 'house churches,'"[7] at the same time "prayer meetings and Bible study groups held in house churches are legal and generally are not subject to registration requirements so long as they remain small and unobtrusive."[8] Moreover, the 2003 Religious Freedom Report indicates that "[f]oreign and Chinese sources estimate that some 30 million persons worship in Protestant house churches that are independent of government control."[9]  Although we agree with Chen that the 2003 Religious Freedom Report indicates that in some cases religious adherents have been persecuted, because the specific examples of detention or arrest in 2002 that amount to

spiritual movements such as the Falun Gong.") (emphasis added).

[5]    R. 232, 2003 Religious Freedom Report.

[6]    R. 229, 2003 Religious Freedom Report.  <u>See also</u> R. 232 ("Overall, the basic policy of permitting religious activity to take place relatively unfettered in government approved sites and under government control remained unchanged.").

[7]    R. 232, 2003 Religious Freedom Report (emphasis added).

[8]    R. 233, 2003 Religious Freedom Report.

[9]    R. 230, 2003 Religious Freedom Report.

persecution appear to be predominantly focused on the Falun Gong, underground seminaries, and religious leaders, and because the overall number appears small compared to the enormous number of unregistered Protestant adherents, we conclude that the 2003 Religious Freedom Report does not compel a finding of persecution to a reasonable degree.[10]

The specific passages in the 2002 Country Report to which Chen points do not require us to conclude otherwise. Chen argues that the 2002 Country Report generally indicates that the authoritarian Chinese government seeks to control "every aspect of people's lives in China," including religious thought and worship through state regulation. However, regulation does not necessarily amount to persecution. Chen further points to a passage indicating that legal protections in reeducation-through-labor camps "are routinely violated,"[11] but neither report indicates a reasonable possibility that Chen will be subjected to detention for her Protestant beliefs. Although the 2002 Country Report indicates that there are religious adherents who have experienced conduct amounting to persecution, like the 2003 Religious Freedom Report, the 2002 Country Report is vague with respect to how many and which religious adherents in particular experience any level of government intimidation or suppression, and for those who do, at what degree and frequency such intimidation or suppression occurs such as to constitute

---

[10]    R. 236, 2003 Religious Freedom Report.

[11]    R. 295, China Country Reports on Human Rights Practices—2002 ("2002 Country Report").

persecution.  Accordingly, we conclude that the IJ's denial of Chen's application for asylum is supported by substantial evidence.

B.    **Withholding of Removal**

To be eligible for withholding of removal, an applicant must demonstrate a "clear probability" of persecution on the basis of race, religion, nationality, membership in a particular social group, or political opinion.  See, e.g., Zhang v. Gonzales, 432 F.3d at 344; Faddoul, 37 F.3d at 188; see also Efe v. Ashcroft, 293 F.3d 899, 906 (5th Cir. 2002) (writing that an applicant for withholding of removal must show "'it is more likely than not' that his life or freedom would be threatened by persecution" (quoting 8 C.F.R. § 208.16(b)(1))).  Although the standard for withholding of removal is in one regard less stringent than that required to establish eligibility for asylum, where an applicant must also show a subjective fear of persecution, the requirement of "clear probability" of persecution requires the applicant to show a higher objective likelihood of persecution than that required for asylum.  Efe, 293 F.3d at 906; Faddoul, 37 F.3d at 188.  Because the evidence does not compel us to conclude that Chen's fear of persecution on the basis of religion is well-founded under the lower objective standard for asylum, we necessarily conclude that she is not eligible for withholding of removal under the higher objective standard.  See, e.g., Efe, 293 F.3d at 906; Faddoul, 37 F.3d at 188 n.7.

C.    **Relief Under the Convention Against Torture**

The Convention Against Torture provides that

> 1. No State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.
> 2. For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights.[12]

Claims based on the Convention Against Torture differ from those based on eligibility for asylum or withholding of removal because the claim need not be based on race, religion, nationality, membership in a particular social group, or political opinion. Zhang, 432 F.3d at 344 (citing Efe, 293 F.3d at 907). Claims brought under the Convention Against Torture further differ because "proof of torture, not simply persecution" is required. Id. Accordingly, with regard to the conduct complained of, applicants seeking relief under the Convention Against Torture must satisfy a more rigorous standard than that for asylum. Efe, 293 F.3d at 907. Torture is defined as:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

---

[12] United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. III, Feb. 4, 1985, 1465 U.N.T.S. 85.

8 C.F.R. § 208.18(a)(1).  Finally, an applicant for relief under the Convention Against Torture has the burden of demonstrating "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."  Id. § 208.16(c)(2) (emphasis added).

Chen asserts that the IJ erred in two respects that independently qualify her for relief under the Convention Against Torture.  First, Chen argues that she will be detained as a result of leaving China illegally and that conditions in Chinese detention facilities rise to the level of torture.  As an initial matter, we note that "the normal incidents of lawful sanctions do not constitute torture."  Zhang, 432 F.3d at 345; 8 C.F.R. § 208.18(a)(3) ("Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions. Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty, but do not include sanctions that defeat the object and purpose of the Convention Against Torture to prohibit torture."). Chen has provided, as evidence that she is more likely than not to be tortured if returned, what the Seventh Circuit has called a "huge mass of evidence bearing on the . . . issue."  Lian v. Ashcroft, 379 F.3d 457, 461 (7th Cir. 2004) (considering the same body of evidence as that which Chen's counsel proffers in this case).

Chen argues that because she has proffered the same evidence as the petitioner in Lian—and in Lian, the Seventh Circuit remanded the case to the IJ after the IJ concluded that the

petitioner would <u>not</u> be subject to torture——<u>Lian</u> then supports a conclusion that Chen has satisfied the standard for relief under the Convention Against Torture. Although <u>Lian</u> is instructive to our inquiry in its contemplation of the significance of the record, <u>Lian</u> does not hold that all applicants who leave China illegally are eligible for relief under the Convention Against Torture because of conditions in Chinese detention facilities. In <u>Lian</u>, the court remanded the petitioner's case after concluding that the IJ denied relief on the basis of reasons not supported in the record and without considering the evidence offered by the petitioner. <u>Id.</u> at 459. In doing so, the court stated "[t]his is not to say that Lian has proved his case under the torture convention." <u>Id.</u> at 460.

Unlike <u>Lian</u>, in Chen's case the IJ did not rely on erroneous assumptions to deny relief. Furthermore, the IJ in Chen's case expressly considered the record to conclude that although it was "likely that [Chen] would be detained and required to pay some type of bail or fine and certainly the conditions in the Chinese jails are not what they would be here," Chen nevertheless failed to show that it was more likely than not that those conditions would subject her to torture. Accordingly, our inquiry is different from that in <u>Lian</u>, and we review the record to determine if the evidence compels a contrary conclusion.

Like the evidence regarding persecution, Chen's evidence regarding Chinese prisons and detention facilities is troubling. The 2002 Country Report indicates that "conditions in penal institutions for both political prisoners and common criminals

generally were harsh and frequently degrading," and that "police and other elements of the security apparatus employed torture and degrading treatment in dealing with some detainees and prisoners"[13] with reports from some individuals that they were subject to electric shock, solitary confinement, beatings, shackles, and other forms of abuse. The 2002 Country Report further states that "[c]onditions in administrative detention facilities, such as reeducation-through-labor camps . . . were similar to those in prisons."[14] The 2002 Country Report indicates that several deaths occurred in one reeducation-through-labor camp in Sichuan Province in 2000 as a result of overwork, poor medical care, and beatings by guards.

A careful review of the record indicates that there appears to be no question that some individuals in China have been subjected to acts constituting torture in either prisons or detention centers, and that some illegal emigrants are sent to reeducation-through-labor camps. Although the gravity of this reality does not escape us, the information in the record does not indicate with any certainty that illegal emigrants are <u>more likely than not</u> sent to reeducation-through-labor camps, and then subjected to torture. <u>Cf.</u> <u>Lian</u>, 379 F.3d at 461 ("How one translates all this vague information into a probability that [the petitioner] will be tortured (remember the test is "more likely than not") is a puzzler."). Consequently, Chen's evidence does not compel us to conclude that she will more likely than not

---

[13]    R. 297, 2002 Country Report.

[14]    R. 297, 2002 Country Report.

be subjected to torture for leaving China illegally.

The 2002 Country Report supports this conclusion, indicating that "[p]ersons who were trafficked from the country and then repatriated sometimes faced fines for illegal immigration upon their return. After a second repatriation, such persons could be sentenced to a term in a reeducation-through-labor camp."[15] Accordingly, the IJ's conclusion that Chen may face a fine upon her return, and that Chen will not likely face torture is supported by substantial evidence. Even if Chen is detained after her first repatriation,[16] although the 2002 Country Report and other evidence indicates that some detainees have been subject to torture, we do not find that the generalized evidence compels a conclusion that it is more likely than not that detainees as a whole are subject to torture, or that detainees detained on account of repatriation as a subgroup—as opposed to those detained on other grounds—are more likely than not to be subject to torture. See Lin v. Gonzales, 432 F.3d 156, 161 (2d Cir. 2005).

Chen's second claim for relief under the Convention Against Torture is that she will be tortured by snakeheads and money lenders upon her return to China and that Chinese officials will be acquiescent in such torture. Like her first claim under the Convention Against Torture, Chen must show that the evidence

---

[15]    R. 329, 2002 Country Report.

[16]    Chen's evidence includes a series of 1999 newspaper articles indicating that in Fujian Province 215 illegal immigrants were detained after being repatriated from Cambodia for the first time.

compels a finding that it is more likely than not that she will be tortured if returned to China. The Convention Against Torture, however, protects against torture only when it is "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). In that Chen's second claim rests on torture by non-governmental snakeheads and money lenders, she must also demonstrate that sufficient state action is involved in that torture. Tamara-Gomez v. Gonzales, 447 F.3d 343, 351 (5th Cir. 2006).

Chen first argues that the IJ applied the wrong legal standard for "acquiescence" in denying her claim based on a lack of state action. She asserts that the IJ, in finding that the Chinese government was making substantial efforts to combat official corruption, required her to prove that the Chinese government would be actually acquiescent in——or actually accept——the torture in order to qualify for relief under the Convention Against Torture. She argues, based on cases from the Second and Ninth Circuits, that the level of government involvement that constitutes "acquiescence" is not actual acceptance of torture but rather mere awareness or willful blindness of torture, and a failure to prevent it. Khouzam v. Aschroft, 361 F.3d 161 (2d Cir. 2004); Zheng v. Ashcroft, 332 F.3d 1186 (9th Cir. 2003). Accordingly, she asserts that she only has to prove that the Chinese government is aware that snakeheads and money lenders torture people and that the government fails to prevent that torture.

We conclude that the IJ applied the correct legal standard for government acquiescence and that Chen's characterization of the IJ's conclusion is overstated. First, we observe that Zheng, the Ninth Circuit case Chen relies on, does not depart from Fifth Circuit precedent. In Ontunez-Tursios v. Ashcroft, we stated that the proper inquiry for "acquiescence" is "willful blindness," or whether public officials "would turn a blind eye to torture." 303 F.3d 341, 354-55 (5th Cir. 2002). In Zheng, the Ninth Circuit quoted the Ontunez-Tursios standard with approval and agreed with it to hold that the petitioner there was only required to prove that torture by snakeheads would be carried out with the awareness of Chinese government officials. 332 F.3d at 1195-96. Second, there is no indication that the IJ denied Chen's claim by requiring that she show "actual" government acquiescence to torture. In characterizing Chen's claim for relief under the Convention Against Torture, the IJ stated:

> I guess another aspect of this would be whether if the money lenders who have not yet been paid came after her might the government look the other way and therefore be at least complicit in whatever might happen to [her] at the hand of these loan sharks, and perhaps then whatever would happen to [her] that might be seen as torture if the government were aware of any penalties being meted out and took no action to protect the respondent.

(Emphases added.) This recitation, indicating that government officials would be complicit in torture if they "look[ed] the other way" or "were aware" of torture and "took no action" is consistent with the willful blindness standard as set forth in Ontunez-Tursios.

In reviewing the evidence, the IJ subsequently held that

> it seems to the Court that it's very problematic any such harm would occur and moreover that if it did that the government would be acquiescent in it and that it would seem that the government of China would be attempting to arrest and prosecute these snakehead criminal syndicates . . . again the Court's reading of the Country report suggests that there is a substantial effort on the part of the government of China to detect and arrest and prosecute corrupt public officials.

Consideration of government efforts to combat corruption or abuse does not raise the legal standard for acquiescence as Chen suggests, and instead is relevant to the willful blindness inquiry. In Tamara-Gomez, this court considered, in concluding that the state action requirement was not met, efforts by the Columbian government to combat a non-governmental narco-terrorist guerrilla group from whose torturous conduct the petitioner sought relief under the Convention Against Torture. 447 F.3d 343. We concluded that "neither the failure to apprehend the persons threatening the alien, nor the lack of financial resources to eradicate the threat or risk of torture constitute sufficient state action for purposes of the Convention Against Torture." Tamara-Gomez, 447 F.3d at 351. The government's inability to provide "complete security" to the petitioner from the guerrilla group did not rise to the level of state action. Id. Accordingly, it was proper for the IJ here to consider efforts by the Chinese government to combat alien smuggling rings and official corruption in the willful blindness inquiry.

Having determined that the IJ did not apply the incorrect legal standard for governmental "acquiescence," we turn to Chen's

argument that the IJ's determination is not supported by substantial evidence.  We review the evidence relevant to both requirements for relief under the Convention Against Torture: that Chen demonstrate the probability of sufficient state action and torture.  Regarding state action, we conclude that Chen's evidence does not compel a finding that government officials will acquiesce to torture by snakeheads or money lenders.  The 2002 Country Report discusses many forms of human trafficking (e.g., internal bride trafficking, sex exploitation, child kidnapping, and indentured servitude), including alien smuggling.[17]  The 2002 Country Report indicates that the Chinese government prosecuted alien smugglers: "Alien smugglers were fined $6,000 and most were sentenced to up to 3 years in prison, although some have been sentenced to death."[18]  As for corrupt officials, the report indicates generally that there were reports of official complicity with alien smuggling, but that the government had prosecuted and sentenced 18,000 officials on corruption-related charges in 2000.  The 2002 Country Report does not indicate the form in which official complicity occurs, and whether, for our purposes, it extends to torturous retribution meted out by alien smugglers.  On balance, although Chen's evidence demonstrates the existence of snakeheads and generally describes instances of official corruption, in light of the government's prosecution of alien smugglers and corrupt officials, the evidence does not compel a conclusion that the government will more probably than

---

[17] R. 328-30, 2002 Country Report.

[18] R. 329, 2002 Country Report.

not acquiesce in torture.

Turning to the probability of torture, we also do not find it more likely than not that Chen will be tortured by snakeheads upon her return to China. Chen testified that she repaid snakeheads with money her family borrowed from money lenders, and it is this second debt to money lenders that she is now repaying. Chen's testimony indicates both that the snakeheads are individuals distinct from the money lenders and that her obligation to the snakeheads has been satisfied. Accordingly, a conclusion that she will be tortured by snakeheads as retribution for a debt she has already repaid is not supported by the evidence. In regard to torture by money lenders, Chen's argument focuses entirely on the conduct of snakeheads in China, without making any connection between snakeheads and money lenders and without establishing any probability of torture at the hands of money lenders. As a result, the IJ's conclusion that Chen is not likely to be subjected to torture at the hands of money lenders is supported by substantial evidence.

## IV. CONCLUSION

For the foregoing reasons, the petition for review of the BIA's order is DENIED.