# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 12, 2009

Charles R. Fulbruge III
Clerk

No. 07-60464

QINGLIN CHENG,

Petitioner,

v.

ERIC H. HOLDER, JR., U.S. ATTORNEY GENERAL,

Respondent.

Petition for Review of an Order of the
Board of Immigration Appeals
BIA No. A95 585 785

Before JONES, Chief Judge, and OWEN and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Qinglin Cheng, a citizen of the People's Republic of China, has petitioned for review of a Board of Immigration Appeals (BIA) denial of his application for asylum, withholding of removal, and relief under Article 3 of the United Nations Convention Against Torture (CAT).[1]  Cheng argues that the immigration judge (IJ) erred in requesting additional corroborative evidence and in finding that

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] *See* 8 C.F.R. § 208.16.

Cheng did not establish past persecution or a well-founded fear of future persecution. For the reasons discussed below, we deny the petition for review.

**I**

In 2002, the United States instituted removal proceedings against Cheng, alleging that he was an alien present in the United States without admittance or parole. Cheng admitted the government's allegations but filed an application for asylum, withholding of removal, and relief under the CAT. In his application, Cheng claimed he feared that removal to China would result in imprisonment and a loss of freedom to practice his Christian religion.

At the evidentiary hearing before the IJ, Cheng testified that a friend's family introduced him to the Bible and Christianity and that he was baptized in 1995. Beginning in 1995, Cheng and a group of eight or nine teenagers, including his brother, met at a home to read and discuss the Bible and pray. Cheng testified that he believed the meetings were not illegal, but the local government warned the group three or four times not to participate in "superstitious activities" or to form an "underground church."

After the group received the warnings, the local police came to a meeting and arrested the attendees, claiming that the discussions were antigovernment and antiparty and that the group was disturbing the peace. Prison guards told Cheng that documents "issued from the top" were served for his arrest, but Cheng did not see the papers. Following his arrest, Cheng was interrogated and instructed to write a letter stating that he regretted his actions. The other group members wrote such letters and were released. When Cheng refused, a police officer cursed at Cheng, threatened him with a police baton, and hit him in the waist. Cheng felt dizzy, threw up, and fainted.

Cheng was transferred to a temporary jail, where he remained for eight or nine days. While he was in custody, the police continued to interrogate him and demand that he write an apology letter. The guards also laughed when Cheng was hit by another inmate and ignored Cheng's pleas for assistance. Cheng was eventually released after his father arranged for a payment of 5,000 renminbi. The police did not provide any documentation of the payment.

Following his release, Cheng went home and visited a private physician. He said that he did not go to an official clinic because it was "too expensive and too much trouble." Cheng testified that there were no records of his treatment, and when asked why, Cheng stated that "it was on the street and all neighbors go for any kind of illness (indiscernible)." Cheng attempted to return to school, but the school told him he could not attend "because [he] was involved in religious or superstitious activities." Cheng was also unable to obtain a local job because of his arrest, so he went to another province to look for work. After leaving home, Cheng was required to check in periodically with the local police station in his home province by telegraphed messages. Cheng had trouble retaining employment in other provinces because of his ongoing reporting requirement and correspondence with the police in his home province; when employers saw that Cheng received telegrams from a police station "they would assume that [he] did something illegal so they [would] fire" him.

After briefly attending government churches in the other provinces, Cheng attended weekly meetings similar to the group meetings he had attended in his home province. Cheng learned of the groups through contacts he made while working in a jewelry shop; Cheng would ask customers that came into the store

seeking crosses for information about local churches. He was not arrested in the other provinces.

The group in Cheng's home province continued to meet, but less frequently than before their arrest, and the group moved meeting locations frequently to avoid government interference. Cheng's brother similarly lived in different provinces and checked into the police station, though he was required to check in less frequently because he signed a letter admitting his guilt. His brother continued to attend the underground churches and had not been arrested. Cheng testified that similar groups were forced to disband and that his mother told him about a woman who was arrested and sentenced to a year and a half for antigovernment and antiparty discussions and an illegal gathering.

In 2001, Cheng left China after paying a smuggler to bring him to the United States through Hong Kong and South America. Cheng stated that he left because of a lack of religious freedom and the requirement that he report back to his home police station. Cheng continued to practice his religious beliefs in the United States, and, when asked, he was able to name several books of the New Testament.

Cheng testified that he would be arrested if he returned to China because of his religious beliefs and his failure to report to the police in his home province. After he left China, the police told Cheng's family that they must report to the police station upon Cheng's return or be arrested and charged with aiding a criminal.

In addition to Cheng's testimony, the IJ considered a letter from Cheng's mother, a transcript of a hearing held by the United States Commission on International Religious Freedom, an Associated Press article, the U.S.

4

Department of State's International Religious Freedom Report for 2002, a Human Rights Watch report, a U.S. Department of State Country Report on Human Rights Practices for 2001, and a U.S. Department of State publication from 1998 entitled *China: Profile of Asylum Claims and Country Conditions*.

The IJ found Cheng credible but also found that he failed to submit corroborating documents that should have been reasonably available, including documentation of his arrest, letters from his church colleagues who were also arrested with him, and a medical report verifying the injuries he received when he was in prison. The IJ found that Cheng failed to meet his burden to show past persecution or a well-founded fear of future persecution because he did not present evidence to show that "the detention was anything other than an isolated incident which did not rise to the level of persecution," Cheng continued to attend house churches in China for six years, and Cheng's original church group still meets and his brother attends those meetings. Because Cheng failed to meet the lower burden of proof for asylum, the IJ found that he also failed to sustain the higher burden of proof for withholding of removal. Finally, the IJ found that Cheng failed to show that it was more likely than not that he would be tortured if he returned to China, and the IJ denied his application for withholding of removal pursuant to the CAT.

The BIA adopted and affirmed the IJ's decision. The Board specified that it agreed with the IJ that the one-time arrest and detention did not amount to past persecution and that the evidence in the record did not give rise to a well-founded fear of future persecution. The Board also specified that the fact that Cheng stayed in China for six years following his arrest and detention and

attended underground churches over that time undermined Cheng's claim of a well-founded fear of future persecution.

Cheng appeals the BIA's decision. This court has jurisdiction to review a final order of removal pursuant to 8 U.S.C. § 1252.

## II

Because the BIA adopted and affirmed the IJ's decision, we review both the IJ's and BIA's decisions.[2] We review factual findings for substantial evidence and questions of law de novo,[3] "defer[ing] to the BIA's interpretation of immigration regulations if the interpretation is reasonable."[4] The conclusion that an applicant is not eligible for asylum, withholding of removal, or relief under the CAT is a factual conclusion,[5] and those "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."[6]

---

[2] *See Mikhael v. INS*, 115 F.3d 299, 302 (5th Cir. 1997) ("We have authority to review only an order of the BIA, not the IJ, unless the IJ's decision has some impact on the BIA's decision. Here, the BIA affirmed the IJ's decision 'based upon and for the reasons set forth in that decision'—in essence, the BIA adopted the IJ's decision. Thus, we must review the IJ's decision." (citations omitted)).

[3] *Zhu v. Gonzales*, 493 F.3d 588, 594 (5th Cir. 2007).

[4] *Bolvito v. Mukasey*, 527 F.3d 428, 435 (5th Cir. 2008).

[5] *See Chen v. Gonzales*, 470 F.3d 1131, 1134 (5th Cir. 2006) ("We apply [the substantial evidence test] in reviewing an IJ's factual conclusion that an applicant is not eligible for asylum, withholding of removal, and relief under the Convention Against Torture." (citations omitted)).

[6] *Id.* (quoting 8 U.S.C. § 1252(b)(4)(B)).

### III

To be eligible for asylum, an applicant has the burden of proof to establish that he is a "refugee."[7] A person is a refugee if he has suffered past persecution or has a well-founded fear of future persecution.[8] An applicant can establish past persecution by showing that he "has suffered persecution in the past in [his] country of nationality . . . on account of race, religion, nationality, membership in a particular social group, or political opinion, and is unable or unwilling to return to, or avail himself . . . of the protection of, that country owing to such persecution."[9] Cheng claims that he has suffered past persecution and has a well-founded fear of future persecution in China on account of his Christian beliefs.

This court has defined "persecution" as:

> The infliction or suffering of harm, under government sanction, upon persons who differ in a way regarded as offensive (e.g., race, religion, political opinion, etc.), in a manner condemned by civilized governments. The harm or suffering need not be physical, but may take other forms, such as the deliberate imposition of severe economic disadvantage, or the deprivation of liberty, food, housing, employment, or other essentials of life.[10]

However, persecution "does not encompass all treatment that our society regards as unfair, unjust or even unlawful or unconstitutional."[11]

---

[7] 8 C.F.R. § 1208.13(a).

[8] *Id.* § 1208.13(b).

[9] *Id.* § 1208.13(b)(1).

[10] *Chen*, 470 F.3d at 1135 (quoting *Abdel-Masieh v. INS*, 73 F.3d 579, 583 (5th Cir. 1996)).

[11] *Tesfamichael v. Gonzales*, 469 F.3d 109, 114 (5th Cir. 2006) (quoting *Majd v. Gonzales*, 446 F.3d 590, 595 (5th Cir. 2006)).

7

The IJ found that Cheng failed to establish past persecution or a well-founded fear of future persecution because his detainment was an "isolated incident which did not rise to the level of persecution." The IJ also noted that Cheng's original house church continued to meet and his brother continued to attend those meetings. The IJ concluded that "[t]here is no indication that he is in danger." The BIA, in adopting and affirming the IJ's opinion, noted the fact that Cheng stayed in China for six years following his detention and attended underground churches over that time undermined Cheng's claim of a well-founded fear of future persecution.

The IJ's conclusion that Cheng did not establish past persecution is supported by substantial evidence. Although Cheng was detained and suffered some physical injury during his detention, the IJ concluded that this was an isolated incident. We cannot say that the evidence compels a contrary conclusion.[12]

Cheng also claims that he established a well-founded fear of future persecution. Proof of a well-founded fear of future persecution requires a subjective fear of persecution that is objectively reasonable.[13] Because the IJ found Cheng credible, Cheng's possession of a subjective fear is not at issue.[14] To

---

[12] *See id.* at 117 (holding that an arrest and one-month detention and two brief searches "fail[ed] to rise to the level of physical persecution").

[13] *Chen*, 470 F.3d at 1135; *see also Tesfamichael*, 469 F.3d at 113 ("The alternative asylum ground, a well-founded fear of persecution, results when a reasonable person in the same circumstances would fear persecution if deported.").

[14] *See Zhao v. Gonzales*, 404 F.3d 295, 307 (5th Cir. 2005) ("The IJ explicitly credited Zhao's testimony, so Zhao's possession of a subjective fear is not at issue.").

establish the objective reasonableness of a well-founded fear of persecution, the applicant must show:

> (1) he possesses a belief or characteristic a persecutor seeks to overcome by means of punishment of some sort; (2) the persecutor is already aware, or could become aware, that the alien possesses this belief or characteristic; (3) the persecutor has the capability of punishing the alien; and, (4) the persecutor has the inclination to punish the alien.[15]

This court has also held that an applicant can show the objective reasonableness of his fear of persecution by establishing a "pattern or practice" in the home country of persecution of a group of persons similarly situated on one of the protected grounds.[16]

First, we have previously held that at least one of the materials very similar to those on which Cheng relied—the 2002 International Religious Freedom Report[17]—does not compel a finding of a pattern or practice of persecution of unregistered or underground churches in China.[18] While Cheng submitted other background information that could lead a reasonable fact finder to conclude that there is a pattern or practice of persecution of house-church members in China,[19] those documents also contain information from which a

---

[15] *Chen*, 470 F.3d at 1135-36 (quoting *Zhao*, 404 F.3d at 307).

[16] *Zhao*, 404 F.3d at 307 (quoting 8 C.F.R. § 208.13(b)(2)(iii)(A)-(B)).

[17] BUREAU OF DEMOCRACY, HUMAN RIGHTS, AND LABOR, U.S. DEP'T OF STATE, INTERNATIONAL RELIGIOUS FREEDOM REPORT 2002, CHINA (INCLUDES HONG KONG AND MACAU) (2002) [hereinafter 2002 RELIGIOUS FREEDOM REPORT].

[18] *See Chen*, 470 F.3d at 1137-38 ("[W]e conclude that the 2003 Religious Freedom Report does not compel a finding of persecution to a reasonable degree.").

[19] *See, e.g.*, BUREAU OF DEMOCRACY, HUMAN RIGHTS AND LABOR, U.S. DEP'T OF STATE, CHINA: PROFILE OF ASYLUM CLAIMS AND COUNTRY CONDITIONS 5 (1998) [hereinafter ASYLUM

reasonable fact finder could conclude there is not a pattern or practice of persecution of unregistered or underground churches.[20] Thus, the record does not *compel* the conclusion that there is a pattern or practice of persecution. Therefore, Cheng's well-founded fear of future persecution must rest on the claim that he will be "singled out for persecution."[21]

Cheng provided testimony regarding his original detention and a letter from his mother stating that several of Cheng's friends had been arrested and that the police frequent Cheng's family's home and have asked questions, searched the home, and threatened Cheng's father with imprisonment. The IJ found Cheng credible and "[did] not question that [he] was detained and mistreated" but noted that Cheng remained in China practicing Christianity for six years before departing for the United States and that his brother still

---

CLAIMS AND COUNTRY CONDITIONS] ("[P]olice closed . . . hundreds of Protestant 'house church' groups. Leaders of these groups were targets of harassment, have been detained for lengthy investigations, and in some cases churches—or church property—were destroyed."); 2002 RELIGIOUS FREEDOM REPORT, *supra* note 17 ("During the period covered by this report, the Government's respect for freedom of religion and freedom of conscience remained poor, especially for many unregistered religious groups and spiritual movements . . . . The Government continued its crackdown on unregistered churches, temples, and mosques.").

[20] *See, e.g.*, 2002 RELIGIOUS FREEDOM REPORT, *supra* note 17 ("[Sources at] both officially sanctioned and underground places of worship all report that the numbers of believers in the country continued to grow."); *id.* ("Many house churches . . . were tolerated by the authorities as long as they remained small and unobtrusive."); BUREAU OF DEMOCRACY, HUMAN RIGHTS, AND LABOR, U.S. DEP'T OF STATE, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2001, CHINA (INCLUDES HONG KONG AND MACAU) (2002) ("In other regions, registered and unregistered churches were treated similarly by the authorities and reported little or no day-to-day interference in their activities."); ASYLUM CLAIMS AND COUNTRY CONDITIONS, *supra* note 19, at 5 ("[T]he Government generally permits small groups (10 to 20 persons) of believers to gather and worship privately in their homes . . . .").

[21] *Zhao*, 404 F.3d at 307.

attended meetings of the original house church. The IJ concluded that "[t]here is no indication that he is in danger."

We cannot say, based on this record, "that the evidence is so compelling that no reasonable factfinder could reach [the IJ's] conclusion."[22] For the same reasons, we will not disturb the IJ's conclusion that Cheng failed to establish eligibility for withholding of removal. Nor will we disturb the IJ's and the BIA's determinations regarding Cheng's claim for protection under the CAT. Cheng failed to establish that it was more likely than not that he would be tortured if removed to China.

## IV

Finally, Cheng argues that the IJ erred in requiring corroborative evidence. We do not agree that the IJ's decision is based, in whole or in any material part, on the failure to provide such evidence.

The IJ's decision does discuss the lack of certain corroborating evidence.[23] However, the IJ's decision credited all of Cheng's testimony regarding the subjects the IJ found to lack corroboration. The decision accepted as true all

---

[22] *Chen*, 470 F.3d at 1134; *see also* 8 U.S.C. § 1252(b)(4)(B) ("[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary . . . .").

[23] The decision states:

*Corroboration.* The respondent submitted several background and condition reports regarding China's policy towards religion. However, he failed to submit the documents which should be reasonably available to him. He has no supporting documentation of his arrest, and, he does not even have a letter from any of his colleagues who were arrested with him in September 1995, verifying the facts of his arrest. Further, the respondent has been unable to obtain a medical report verifying his injuries that occurred as a result of his time in prison. This evidence is the type which is reasonably attainable by his friends and family in China with whom he still has contact. [citation omitted]

Cheng said regarding his arrest and injuries while in prison. The decision states, "The Court does not question that the respondent was detained and mistreated, but there is no evidence to suggest that the detention was anything other than an isolated incident which did not rise to the level of persecution." The decision then discusses other evidence that supports the IJ's conclusion that Cheng had not established past persecution and did not have a well-founded fear of future persecution. Any lack of corroborative evidence did not affect the outcome in the proceedings before the IJ.

\* \* \*

The petition for review is DENIED.