**REVISED AUGUST 8, 2014**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-60381

CRUZ ALBERTO GARCIA,

United States Court of Appeals
Fifth Circuit

**FILED**

July 1, 2014

Lyle W. Cayce
Clerk

Petitioner

v.

ERIC H. HOLDER, JR., U. S. ATTORNEY GENERAL,

Respondent

Petition for Review of an Order of the
Board of Immigration Appeals

Before KING, HAYNES, and GRAVES, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

Cruz Alberto Garcia, proceeding pro se, petitions this court for review of a Board of Immigration Appeals ("BIA") decision. The BIA dismissed his appeal from the Immigration Judge's ("IJ") denial of his application for statutory withholding of removal and Convention Against Torture ("CAT") protection. We deny the petition for review as to statutory withholding, grant the petition for review as to CAT protection, and remand to the BIA for further consideration of Garcia's petition for CAT protection.

No. 13-60381

## I. Factual and Procedural Background

In 2006, Garcia, a native and citizen of El Salvador, was ordered removed in absentia to El Salvador after he failed to appear at a removal hearing and answer charges that he was an alien present in the United States without being admitted or paroled.  *See* 8 U.S.C. § 1229a(b)(5)(A).  Garcia was removed in June 2011, but reentered the United States illegally in February 2012.  In March 2012, the Department of Homeland Security ("DHS") reinstated the 2006 removal order.  *See* 8 U.S.C. § 1231(a)(5).  Because Garcia expressed a fear of persecution or torture if removed to El Salvador, he was referred to an asylum officer for an interview.  *See* 8 C.F.R. § 241.8(e).  The asylum officer found that Garcia did not have a reasonable fear of persecution but that he did have a reasonable fear of torture, and referred the case to an IJ.  *See* 8 C.F.R. § 208.31(e).  Garcia filed a pro se application for statutory withholding of removal under 8 U.S.C. § 1231(b)(3)(A) and for relief under the CAT.

At his hearing before the IJ, Garcia testified to the events occurring between his 2011 removal from the United States, and his 2012 illegal reentry. He testified that when he returned to El Salvador after being removed, he lived and worked in San Salvador.  In August 2011, Garcia submitted documents to renew his national identification card.  Soon after, he received a call on his cell phone from a man who said he was from the National Registration Center ("NRC") and needed to verify Garcia's information.  The man asked Garcia his name, telephone number, and his address.  He also asked Garcia when he last had an identification check.  Garcia told him that it had been awhile because he had just returned from the United States.

Garcia testified that subsequently, on August 27, 2011, four police officers came to the home of Garcia's brother and sister-in-law, where Garcia was staying.  They were dressed in blue police uniforms with badges, carrying weapons, and wearing masks of the type that law enforcement often used to

cover their faces. According to Garcia, they looked just like the Salvadoran National Civilian Police ("PNC") police officers in photographs Garcia had submitted to the IJ. However, Garcia testified that there was no way of knowing if they were actually police or if they were criminals who had stolen police uniforms. One of the officers told Garcia that he was required to pay the officers $10,000 because he had returned to El Salvador from the United States. Garcia told the police officers that he did not have any money. Garcia was given two weeks to make the payment. One of the officers put a gun in Garcia's face and told him that he and his family would be murdered if he did not pay the money. Although no one was physically injured, Garcia and his family were afraid. Garcia believed that the extortion was connected with the information he had given the NRC official during the August 2011 phone call.

On September 8, 2011, Garcia received a call on his cell phone from an unidentified individual who told him to go to a certain location where he would be given information about depositing the money. After the telephone call, Garcia destroyed his cell phone, and decided to leave his brother's house and stay with a neighbor. On September 18, 2011, while Garcia was at work, the police officers returned to Garcia's brother's house, asking about Garcia's whereabouts. Garcia's brother told him that one of the police officers hit him in the chest and put a gun to his head.

Garcia testified that about a week later, he moved to his aunt's house in the Department of Usulután. He told his brother not to tell anyone about his whereabouts. The government notes that Usulután is about 68 miles from San Salvador. One day, Garcia took the bus to go shopping, and the bus was stopped at a checkpoint. Garcia was asked for his national identification card. The police asked why he was in Usulután when his document stated that he lived in San Salvador. Garcia said that he was in town to shop and that he worked in Usulután. An officer made a phone call and gave some numbers and

No. 13-60381

Garcia's name to someone on the other end of the call. Garcia was detained for over an hour before he was allowed to leave.

On November 15, 2011, Garcia was walking home from work in Usulután when a car stopped and four men got out and beat him so severely that he was hospitalized for a week. Garcia heard one of the men say that the beating was for the money that had not been paid. The men were in civilian clothes and had their faces covered. Garcia was treated at the National Hospital of Usulután. He stated in an affidavit that he submitted to the IJ that the beating was so severe that the perpetrators were probably "sure that [he] was dead." However, he was unable to obtain any documents from the hospital to provide to the IJ. Garcia spent the next two or three months recovering and hiding, until he left El Salvador for the United States in January or February of 2012.

Garcia's mother, aunt, two uncles, and several cousins still live in El Salvador. However, he testified that there was nowhere he could live in El Salvador where "these people" could not find him. He testified that he previously thought he would be safe in Usulután, but they were able to find him there. Garcia testified that he and his family did not report any of the incidents to the police because they believed the police were involved and did not trust the police.

Garcia testified that he feared he would be shot and killed if he returned to El Salvador. He stated that he feared returning to El Salvador because of the government and individuals who worked for the government. The IJ asked why Garcia thought he would be killed, since the extortionists would not be able to get any money if he were dead. Garcia stated that it would no longer be an issue of money, it would be a matter of vengeance because he had "pulled a fast one o[n] them."

Garcia also submitted multiple country reports regarding human rights in El Salvador. According to one of those reports, a May 2012 report by the

No. 13-60381

United States Department of State, some of the "principal human rights" problems in El Salvador are "widespread corruption," "weaknesses in the judiciary and the security forces that led to a high level of impunity," and "isolated unlawful killings by security forces." United States Department of State, *2011 Country Reports on Human Rights Practices – El Salvador*, Executive Summary (2012), *available at* http://www.unhcr.org/refworld/docid/4fc75aa278.html. The PNC Office of the Inspector General reported that of the 964 complaints of police misconduct received during 2011, 679 cases were referred to the Office of the Attorney General and 919 officers were sanctioned in response to complaints filed in 2011 and prior years, including 107 officers who were dismissed for misconduct and 664 who were suspended without pay. *Id.* § 1(c). Further, the Office of the Attorney General investigated 364 cases against police officers, resulting in 258 prosecutions and 10 convictions. *Id.* However, the country report provides that "Although the government took steps to dismiss some officials who committed abuses in the penitentiary system and the police, impunity persisted." *Id.* The PNC Office of the Inspector General reported that in 2011, eight PNC officers were accused of homicide, PNC officers had killed six people, and 27 police officers were arrested on homicide charges. *Id.* § 1(a). The report also noted that "Inadequate training, lack of enforcement of the administrative police career law, arbitrary promotions, insufficient government funding, lack of a uniform code of evidence, and instances of corruption and criminality limited the PNC's effectiveness." *Id.* § 1(d). Further, the report notes that although the law

> provides criminal penalties for official corruption . . . the government did not implement the law effectively, and officials, particularly in the judicial system, engaged in corrupt practices with impunity. The NGO Transparency International in December 2010 reported that government corruption was a serious

5

problem, reflected by public perceptions of corruption in political parties, the police, judicial system, Legislative Assembly, and among public employees.

*Id.* § 4.

After considering the exhibits and Garcia's testimony, which the IJ found to be credible, the IJ denied withholding of removal and CAT protection. The IJ found that the evidence indicated that the perpetrators who harmed Garcia were motivated solely by economic gain. The IJ concluded that Garcia had not established eligibility for withholding of removal under § 1231 because he had not shown that he was harmed on account of a protected ground. With regard to CAT relief, the IJ noted that in order to qualify for CAT protection, the harm must be inflicted by, or with the acquiescence of, a government official. The IJ determined that Garcia's claim failed because he was unable to identify whether the perpetrators who extorted and beat him were actual police officers or just criminals.

Garcia appealed to the BIA. The BIA summarily dismissed Garcia's appeal because he failed to submit an appellate brief. Garcia moved for reconsideration of the dismissal of his appeal. The BIA granted the motion, vacated its prior decision, reinstated Garcia's appeal, and dismissed the appeal on the merits. With regard to withholding, the BIA agreed with the IJ's determination that Garcia had not established the requisite likelihood of persecution based on a protected ground. With regard to CAT protection, it agreed with the IJ that Garcia had not shown the required government acquiescence because Garcia was unsure whether the extortionists were actual police officers or just common criminals. Garcia's removal order was reinstated. Garcia filed a timely pro se petition for review.

No. 13-60381

## II. Discussion

We have jurisdiction to review a final order of removal.  *See* 8 U.S.C. § 1252(a)(1) & (5).  The reinstatement of a prior removal order is a reviewable final order.  *See Ojeda-Terrazas v. Ashcroft*, 290 F.3d 292, 291 (5th Cir. 2002).  We review constitutional and legal questions de novo.  *See Ovalles v. Holder*, 577 F.3d 288, 291 (5th Cir. 2009).  We review factual findings for substantial evidence.  *See Chen v. Gonzales*, 470 F.3d 1131, 1134 (5th Cir. 2006).  Under this standard, "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."  8 U.S.C. § 1252(b)(4)(B); *see Chen*, 470 F.3d at 1134.

### A.    *§ 1231 Withholding*

In his pro se brief, which we construe liberally, *see, e.g., Andrade v. Gonzales*, 459 F.3d 538, 543 (5th Cir. 2006), Garcia first asserts that he is eligible for withholding of removal under 8 U.S.C. § 1231.  Under this provision, the Attorney General may not remove an alien to a country if the alien has demonstrated a clear probability that his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."  *Id.* § 1231(b)(3)(A) & (C); *see* 8 C.F.R. § 208.16(b); *Roy v. Ashcroft*, 389 F.3d 132, 138 (5th Cir. 2004).

The BIA agreed with the IJ that Garcia had not shown that he would be persecuted on account of a protected ground, because neither economic extortion nor being mistaken for an affluent Salvadoran national were protected grounds.  We agree.  Garcia did not present any evidence that he would be persecuted on account of one of the specified protected grounds.  Instead, he testified that the perpetrators attempted to extort $10,000 from him because he had just returned from the United States and beat him because he had not paid the money.   This court does "not recognize economic extortion

7

No. 13-60381

as a form of persecution under immigration law, nor does it recognize wealthy Salvadorians as a protected group." *Castillo-Enriquez v. Holder*, 690 F.3d 667, 668 (5th Cir. 2012) (alteration, internal quotation marks, and citation omitted). Because Garcia did not show that he would be persecuted on account of a protected ground, he is ineligible for withholding of removal under § 1231.

## B. *CAT Protection*

The majority of Garcia's brief challenges the determination that he is not eligible for protection under the CAT. "Claims based on the Convention Against Torture differ from those based on eligibility for asylum or withholding of removal because the claim need not be based on race, religion, nationality, membership in a particular social group, or political opinion." *Chen*, 470 F.3d at 1139. For a petitioner to be entitled to CAT relief, he or she must show that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). Torture is defined, *inter alia*, as "any act by which severe pain or suffering . . . is intentionally inflicted on a person for such purposes as . . . intimidating or coercing him . . .by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1).[1] "Thus relief under the [CAT] requires a two part analysis—first, is it more likely than not that the alien will be tortured upon return to his homeland; and second, is

---

[1] The full definition of torture is:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1).

there sufficient state action involved in that torture." *Tamara-Gomez v. Gonzales*, 447 F.3d 343, 350-51 (5th Cir. 2006); *see Chen*, 470 F.3d at 1141.

The government argues and the BIA found that Garcia failed to meet the second prong of the CAT analysis, by showing that any future torture is likely to be inflicted "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1); *see Tamara-Gomez*, 447 F.3d at 350-51. Although the regulation does not define "acting in an official capacity," the Attorney General has interpreted that phrase to mean "under color of law." *See In re Y-L-*, 23 I. & N. Dec. 270, 285 (AG 2002) (citing *Ali v. Reno*, 237 F.3d 591, 597 (6th Cir. 2001)). We have previously adopted the Attorney General's interpretation in two unpublished cases, *see Marmorato v. Holder,* 376 F. App'x 380, 385 (5th Cir. 2010); *Ahmed v. Mukasey*, 300 Fed. App'x 324, 328 (5th Cir. 2008), and now adopt it here.[2] Under this standard, we interpret "under color of law" as we would in a civil rights case. *See Marmorato*, 376 Fed. App'x at 385; *Tamara-Gomez*, 447 F.3d at 350-51 (stating that torture under the CAT must involve "state action"); *see also Ramirez-Peyro v. Holder*, 574 F.3d 893, 900 (8th Cir. 2009) (explicitly following *Ahmed* in adopting "the agency's interpretation of 'in an official capacity' as the equivalent of 'under color of law' as used in the civil-rights context").

Under this standard, the government acquiescence need not necessarily be an officially sanctioned state action; instead, "an act is under color of law when it constitutes a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Marmorato*, 376 Fed. App'x at 385 (internal quotation marks and

---

[2] Although *Marmorato* and *Ahmed* are unpublished and thus non-precedential under the rules of this circuit, *see* 5th Cir. Rule 47.5.4, we find their reasoning persuasive.

alteration omitted) (quoting *United States v. Causey*, 185 F.3d 407, 442 (5th Cir. 1999)).  "We have recognized on numerous occasions that acts motivated by an officer's personal objectives are 'under color of law' when the officer uses his official capacity to further those objectives."  *Id.* (citing *Townsend v. Moya*, 291 F.3d 859, 861-62 (5th Cir. 2002); *Harris v. Rhodes*, 94 F.3d 196, 197 (5th Cir. 1996)).  As the Eighth Circuit has explained, proving action in an officer's official capacity

> does not require that the public official be executing official state policy or that the public official be the nation's president or some other official at the upper echelons of power.  Rather . . . the use of official authority by low-level officials, such a[s] police officers, can work to place actions under the color of law even where they are without state sanction.

*Ramirez-Peyro*, 574 F.3d at 901 (citing *Screws v. United States*, 325 U.S. 91, 111 (1945)).  The "under color of law" inquiry "turns upon the nexus between the petitioner, the improper conduct of those officials in question, and the officers' performance of their official duties."  *Marmorato*, 376 Fed. App'x at 386.

The IJ and BIA denied CAT protection because Garcia admitted that he could not be sure whether the extortionists were actually police officers, or whether they were criminals impersonating police officers, and because Garcia did not report the incidents to the police.  However, government acquiescence in the form of low-level officials acting under color of law could be found even if the extortionists were not clearly police officers.  There is evidence in the record that, regardless of whether the extortionists were police officers, they may have been receiving information about Garcia from other public officials, who obtained that information in their official capacities.  Garcia's testimony, which the IJ specifically found to be credible, reflects that the threats and beating came immediately or soon after Garcia had contact with government

officials, and that he believed the threats and beating were connected to the contact with those officials.  Garcia was first contacted by someone purporting to be from the NRC only after he had submitted documentation to the government to obtain a new national identification card.  Soon after that call, four apparent police officers arrived at his home, demanded $10,000, pointed a gun at his head, and threatened him and his family.  Even though he then fled to a different town, Garcia was later beaten shortly after being stopped and questioned at a police checkpoint.  According to Garcia's testimony, although the men who beat him were dressed in civilian clothes, the men specifically referenced his failure to pay the prior extortion demand.  Based on the sequence of events, one possible conclusion is that the men who threatened and beat Garcia on each occasion were either police officers or other men working in concert with some other government source, such as an official at NRC or the police officers at the checkpoint.  If there were public officials supplying the perpetrators with information that they obtained as part of their official duties, government acquiescence could be shown.  *See Marmorato*, 376 F. App'x at 385-86.

It is true that potential instances of violence committed by non-governmental actors against citizens, together with speculation that the police might not prevent that violence, are generally insufficient to prove government acquiescence, especially if there is evidence that the government prosecutes rogue or corrupt public officials.  *See Chen*, 470 F.3d at 1142-43.  Here, however, Garcia is not basing his CAT claim on the speculation that government officials may be willfully blind to his likely future torture, but on an assertion that they were previously actually involved in or enabled the extortion and beating and are likely to be involved again in the future.  The alleged active involvement of public officials acting in their official capacity and the close temporal proximity between Garcia's contact with public officials

No. 13-60381

and the subsequent threats and beatings support his assertions and warrant further review.

The BIA denied CAT relief solely because it was not clear that the men who threatened and beat Garcia were actual police officers.  Neither the BIA nor the IJ considered the alternative view of the evidence showing that the extortionists may have received their information about Garcia from other government officials acting in their official capacities.  Because of this error regarding what Garcia was required to show to obtain CAT protection, the BIA committed legal error.  We vacate the BIA's decision and remand for the agency to properly consider this evidence under the "under color of law" legal standard.

### III.  Conclusion

For the foregoing reasons, Garcia's petition for review is GRANTED IN PART and DENIED IN PART.  We DENY the petition for review as to the BIA's denial of Garcia's petition for § 1231 withholding, GRANT the petition for review as to the BIA's denial of Garcia's petition for protection under the CAT, VACATE the BIA's decision regarding CAT protection, and REMAND to the BIA for further proceedings consistent with this opinion.[3]  On remand, the BIA should consider whether Garcia will, more likely than not, be tortured by or at the instigation of or with the consent or acquiescence of a public official at any level of government or other person acting under color of law.  *See Marmorato*, 376 Fed. App'x at 387; 8 C.F.R. 208.18(a)(1).  The BIA is also instructed to remand to the IJ for any additional fact finding that is necessary for the BIA to make its determination.

---

[3] Garcia's motion to designate a different country of removal is denied, without prejudice to his right to file that motion with the IJ or BIA, if appropriate.