# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-60399

ARMANDO MATADI,

     Petitioner

v.

WILLIAM P. BARR, U. S. ATTORNEY GENERAL,

     Respondent

Petitions for Review of Orders of the
Board of Immigration Appeals
BIA No. A216 540 427

United States Court of Appeals
Fifth Circuit
**FILED**
July 13, 2020

Lyle W. Cayce
Clerk

Before HAYNES, WILLETT, and OLDHAM, Circuit Judges.

PER CURIAM:*

Petitioner Armando Matadi asks us to review the BIA's denial of his (1) applications for asylum, withholding of removal, and Convention Against Torture (CAT) protection, and (2) motion to reopen proceedings. As the BIA committed no reversible error, we deny Matadi's Petition for Review.[1]

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Matadi filed his original petition for review, concerning the BIA's denial of his applications, on August 6, 2019. Nearly ten months later, on May 26, 2020, Matadi filed a supplemental brief challenging the BIA's denial of his motion to reopen. We refer to these documents collectively as Matadi's Petition for Review.

No. 19-60399

I

A

Matadi, a native and citizen of Angola, applied for admission into the United States on or around February 22, 2018, though he lacked valid documentation, based on his fear of returning to Angola. Specifically, as a Christian pastor, Matadi believes he was persecuted—and will be persecuted if returned to Angola—by the government's controlling party, the People's Movement for the Liberation of Angola (MPLA), for his refusal to encourage churchgoers to join the party.

Matadi's relationship with the MPLA, in relevant part, began in 2013 when the party invited him and other church members to attend a meeting. During the meeting, MPLA representatives asked the attendees to vote for the MPLA; they even offered to buy Matadi an apartment if he encouraged his parishioners to vote for the party. Realizing that the meeting did not concern Christianity, Matadi left, seemingly without consequence.

The next year, Matadi moved to Zango, near Angola's capitol, where he became involved in building a new church in the town. After the building was completed, the government recognized the church through proper documentation and the community legally authorized Matadi to be the church's leader. From 2013 through most of 2016, Matadi was not threatened or harmed by the MPLA. Then, in November 2016, members of the military came to Matadi's home and demolished the structure. When Matadi asked why his home was being destroyed, the military commander threw him to the ground and repeatedly kicked him, resulting in a cut on Matadi's right leg. Matadi reported the incident to municipal administrators, who informed him that they would send people to investigate; however, no one ever came.

Without a home, Matadi sent his wife and daughter to stay with his uncle. On the same day that his home was destroyed, armed "bandits" entered

2

No. 19-60399

his uncle's home, called out Matadi's name, beat his uncle, and stole a computer and money. Because Matadi was not present, the bandits told his uncle "that they're going to find [him]. They will find [him] in any place that [he] will be." This incident was not reported to the police.

Matadi's next alleged encounters with the MPLA occurred eleven months later, in October 2017. On two occasions, Matadi was approached by group of men wearing MPLA shirts. On one occasion, the men made him lay on the ground, took his phone and money, and informed him that the MPLA is big and will always govern, while Matadi is nothing, and that they would "finish [him] out." The men then fled after noticing a group of people approaching, leaving Matadi physically unharmed. These incidents went unreported.

Around the time as these encounters, Matadi's landlord informed him that he could no longer use the building as a church. When he inquired further, the landlord told him that he was going to rent the building out as a store instead. Matadi later learned that the store belonged to an administrator of the MPLA.

Based on these events, Matadi left Angola on December 10, 2017, leaving behind his wife and daughter who continue to live with Matadi's uncle. Matadi traveled from Angola to the United States using a passport that the Angolan government issued to him in 2016.

B

As noted, when Matadi reached the United States, he applied for admission though he did not have valid documentation to do so. Based on his fear of returning to Angola, Matadi was granted a credible fear interview with an asylum officer, who then referred Matadi's case to an immigration judge (IJ). The Department of Homeland Security also served Matadi with a Notice

No. 19-60399

to Appear before an IJ to answer a charge of inadmissibility. *See* 8 U.S.C. § 1182(a)(7)(A)(i)(I).

Matadi appeared before the IJ for his merits hearing, where the court considered his applications for asylum, withholding of removal, and CAT protection. Shortly before the hearing, Matadi submitted a 200-page collection of documents, which included: Matadi's identification documents; a copy of his original asylum application; documents concerning his status and training as a pastor; affidavits from his wife, uncle, and friend; several country conditions reports; and photographs of Matadi and his church (Exhibit 6).

Through an interpreter, the IJ and Government's counsel questioned Matadi about the basis of his applications, during which Matadi recounted the above-enumerated experiences related to the MPLA. At the close of questioning, the IJ orally pronounced his decision. Having "reviewed all of the evidence in [Matadi's] case," the IJ determined that the encounters, while reprehensible, "do not . . . rise[] to the level of the extreme concept known as persecution."

The IJ concluded that the first incident—during which the military destroyed Matadi's home and kicked him—did not rise to the level of persecution and was not reasonably related to his religious beliefs or political affiliation. It noted that the military did not make any statements to him during the encounter to indicate that his home was being destroyed for political reasons and observed that, in 2016, Angolan security officials exercised the government's eminent domain powers and destroyed hundreds of allegedly illegal, privately built homes in Zango, displacing thousands of people irrespective of their religion or political affiliation. The IJ acknowledged that Matadi believed he was being targeted for his refusal to join the MPLA but highlighted that Matadi had also refused to join the MPLA in 2013 and "nothing happened." "Same thing in 2014. Nothing happened. . . . Same thing

in 2015. Nothing happened. . . ." Though he emphasized that the government's behavior was wrong, the IJ concluded that "for asylum purposes[,] it's insufficient to make the necessary connection between them demolishing [Matadi's] home and a protected ground."

As for the robbery at his uncle's house, the IJ accepted Matadi's testimony that the robbers were looking for him but noted that "there's insufficient evidence as to why they were looking for [Matadi]"or "to establish who these people were." From the information provided by Matadi, the IJ had "no idea if they were regular criminals or they were government officials" but noted that "they appear to be regular criminals. . . ." Though they may have been looking for Matadi, they ultimately robbed his family, suggesting "they were motivated by criminal activity and personal financial gain, not by a desire to punish [Matadi] for [his] religion or political opinion.".

The IJ observed that Matadi's next encounters with—who Matadi believed to be—the MPLA did not occur until nearly a year later when Matadi was robbed in his church. While the IJ expressed "no doubt" that Matadi was the victim of a crime, he found that Matadi had provided "insufficient evidence to actually persuade [him] that [the robbers] were actual government officials as opposed to basic criminals." The IJ also emphasized that for the next two months, until Matadi left the country, "the only thing that happened to him was that . . . members of the MPLA pointed their fingers . . . and would say things such as [he is] nothing and that the MPLA is strong and powerful." These experiences, the IJ concluded, "do[] not rise to the level of persecution." Nor did they, in the IJ's view, demonstrate that it was more likely than not that Matadi would be tortured by the Angolan government, or with its consent and acquiescence, if returned.

Based on the evidence presented, or the lack thereof, the IJ denied Matadi's applications for asylum, withholding of removal, and CAT protection.

No. 19-60399

Matadi appealed to the BIA, who affirmed the IJ's factual findings and holdings. Matadi then filed a petition for review in this court. While that petition was pending, Matadi retained pro bono counsel and moved the BIA to reopen the denial of his asylum claim based on newly obtained evidence—specifically, an expert affidavit concerning the country conditions in Angola. However, the BIA denied Matadi's motion, finding that the expert affidavit was neither previously unavailable nor material evidence. So, Matadi filed supplemental briefing to include the BIA's denial of his motion to reopen in his Petition for Review.

II

The Attorney General has discretion to grant asylum to anyone who is "unable or unwilling" to return to his country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1158(b) (referencing § 1101(a)(42) (defining "Refugee")).[2] The asylum applicant bears the burden of demonstrating eligibility for such relief, 8 C.F.R. § 1208.13(a), including establishing a sufficiently strong nexus between the harm he experienced or fears and the protected ground he claims is or will be a central basis for the persecution, 8 U.S.C. § 1158(b)(1)(B)(i).

Unlike whether to grant asylum, a grant of withholding of removal is not discretionary. *Id.* § 1231(b)(3). The Attorney General must grant this relief where the applicant demonstrates a "clear probability"—meaning that it is more likely than not—that his life or freedom will be threatened by persecution

---

[2] Where an applicant proves past persecution, he is entitled to a presumption of a well-founded fear of future persecution. *See* 8 C.F.R. § 1208.13(b)(1). If an applicant has not established past persecution, he must prove a well-founded fear of future persecution to be eligible for asylum. *Id.* §§ 1208.13(a), (b)(2)(iii).

on a protected ground if returned to his country of nationality. *See Faddoul v. INS*, 37 F.3d 185, 188 (5th Cir. 1994).

Applications for CAT protection differ from applications for asylum or withholding of removal because they need not be based on membership in a protected group. *See Garcia v. Holder*, 756 F.3d 885, 891 (5th Cir. 2014). To be entitled to CAT protection, an applicant must demonstrate that it's more likely than not that he will be tortured if removed to the proposed country of removal. *Id.*; *see also* 8 C.F.R § 208.16(c)(2). For CAT purposes, torture means "any act by which severe pain or suffering . . . is intentionally inflicted on a person . . . by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1).

Generally, we only have the authority to review an order of the BIA, not the IJ's decision. *Mikhael v. I.N.S.*, 115 F.3d 299, 302 (5th Cir. 1997). However, where, as here, "the IJ's decision has some impact on the BIA's decision," we may review both. *Id.*; *see also Wang v. Holder*, 569 F.3d 531, 536 (5th Cir. 2009). We review questions of law de novo, *Gonzalez v. Holder*, 771 F.3d 238, 238 (5th Cir. 2014), but we review the BIA's findings of fact for substantial evidence, and they may not be reversed unless we conclude that "any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B); *see also Garcia*, 756 F.3d at 890. In other words, we must uphold the BIA's factual findings as long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481, 483–84 (1992). Due to this deferential standard, we "should not supplant the agency's findings merely by identifying alternative findings that could [also] be supported by substantial evidence." *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992).

Our review of a denial of a motion to reopen is even more deferential, reviewed under the abuse-of-discretion standard. *See Zhao v. Gonzales*, 404

No. 19-60399

F.3d 295, 303 (5th Cir. 2005). Motions to reopen deportation proceedings are "disfavored," *Lara v. Trominski*, 216 F.3d 487, 496 (5th Cir. 2000), because "[g]ranting . . . such motions too freely will permit endless delay of deportation by aliens creative and fertile enough to continuously produce new and material facts. . . ." *INS v. Abudu*, 485 U.S. 94, 107–08 (1988) (internal quotation omitted). Therefore, we will allow the BIA's denial to stand "so long as it is not capricious, racially invidious, utterly without foundation in the evidence, or otherwise so aberrational that it is arbitrary rather than the result of any perceptible rational approach." *Pritchett v. INS*, 993 F.2d 80, 83 (5th Cir. 1993) (internal quotation omitted).

### III

In his Petition for Review, Matadi argues that the IJ and BIA erred in denying his applications for asylum, withholding of removal, and CAT protection by: (1) failing to meaningfully consider the key evidence contained in Exhibit 6; (2) concluding that Matadi did not establish past persecution or a well-founded fear of future persecution; and (3) relying on Matadi's ineligibility for asylum to conclude that Matadi was also ineligible for withholding of removal. Matadi also argues that the BIA erred in denying his motion to reopen because the newly offered evidence is material and could not have been discovered prior to the BIA's original decision. We address each argument in turn.

### A

Matadi first argues that the IJ and BIA committed procedural error by failing to meaningfully consider the evidence presented in Exhibit 6.[3] The BIA

---

[3] The Government argues that Matadi failed to exhaust this claim before the BIA because, in his brief before the agency, he merely argued that IJ "did not consider all of the evidence that [he] filed," without identifying or discussing Exhibit 6. However, because Matadi was proceeding pro se, we will liberally construe his filing and consider this argument

is not required to "specifically address every piece of evidence put before it," but "its decision must reflect meaningful consideration of the relevant substantial evidence supporting the alien's claims." *Abdel-Masieh v. U.S. I.N.S.*, 73 F.3d 579, 585 (5th Cir. 1996). Matadi argues that the BIA failed to satisfy this standard because it did not discuss the country conditions report provided in Exhibit 6, which documents the MPLA's practice of "pressuring churches to support the government in the lead-up to planned elections in August 2017" and "trying to coerce religious groups to align themselves with the ruling party in exchange for authorization to operate freely."[4] We disagree.

On multiple occasions, the IJ and BIA acknowledged that they considered the record as a whole and took notice of the country conditions in Angola. For instance, the IJ generally informed Matadi that he "reviewed all of the evidence in [his] case," and specifically concluded that "after reviewing the entire evidentiary record to include the information contained in Exhibit 6 for identification[,] there is simply insufficient evidence of gross, flagrant or

---

sufficiently exhausted. *See, e.g.*, *Vazquez v. Sessions*, 885 F.3d 862, 868 (5th Cir. 2018); *Burke v. Mukasey*, 509 F.3d 695, 696 (5th Cir. 2007).

[4] Matadi also argues that the report provides significant evidence that the robberies against Matadi and his family were actually conducted by the MPLA because, he suggests, the report notes "that the Angolan government often employed 'plainclothes armed thugs' who were 'de facto agents of the state security service' to attack and intimidate protestors." This is a gross overstatement. In fact, the report notes that "youth protestors," who engaged in public anti-government demonstrations, were subjected to the harassment and violence of these armed individuals—"a so-called group of citizens concerned with stability and peace." The report provides no information to suggest that non-protestors, passive dissenters, or even those who have spoken ill of the government outside of the protest setting have ever experienced such treatment. So while this information suggests that the MPLA is not above relying on civilian criminals to punish active protestors, it does not provide "key" evidence to suggest that the robbers who attacked Matadi and his family were members of this group that is described as acting in an entirely different context, against an entirely different group of people, years before the violations against Matadi occurred. *Compare* the IJ's consideration here, *with Cabrera v. Sessions*, 890 F.3d 153, 163–64 (5th Cir. 2018) (finding IJ procedurally erred where it failed to consider reports supporting petitioner's assertions that she was at particular risk of persecution because of her gender and altogether failed to analyze the characteristics of her claimed particular social group).

mass violations of human rights within Angola to tip the scale. . . ." Further, and more to the point, the IJ directly acknowledged that "[t]he MPLA was setting their sights on [Matadi] and other pastors because of their influence over the congregation and their ability to have their congregation provide more votes for the MPLA." The IJ simply concluded that the government's actions do not amount to persecution or impose a risk that Matadi would be persecuted or tortured if returned to Angola.

And the BIA agreed. It noted Matadi's argument regarding the government's alleged practice of pressuring churches to support the government but gave his contention "little weight." The BIA did not doubt that there is "corruption and some impunity in Angola," but it concluded that these harms do not rise to a level of persecution or risk of torture.

Without doubt, the IJ and BIA could have gone through each document in each exhibit and explained how they weighed the individual pieces of information, but this is not what we require. *Abdel-Masieh*, 73 F.3d at 585 ("We do not require the BIA to specifically address every piece of evidence put before it."). Instead, our procedural review focuses on whether the petitioner "has received full and fair consideration of all circumstances that give rise to his or her claims." *Id.* (internal quotation omitted). Here, the IJ's extended and extensive—if not exhaustive—oral pronouncement, and the BIA's consideration of the same, demonstrate that Matadi was afforded due process.

## B

Matadi next argues that the IJ and BIA erred in concluding that he did not suffer past persecution[5] and does not have a well-founded fear of future

_____

[5] Matadi also argues that the IJ and BIA erred as a matter of law because they failed to consider the aggregate effect of all of the acts of persecution he endured. However, even viewing Matadi's brief to the BIA under the liberal and understanding standard we afford to

persecution. However, because the record evidence does not compel a conclusion contrary to that reached by the IJ and BIA, we find they did not err.

1

The IJ and BIA reasonably determined that the harms Matadi endured do not rise to the level of persecution. In this circuit, "[t]he law regulating persecution claims, although humane in concept, is not generous." *Adebisi v. INS*, 952 F.2d 910, 913 (5th Cir. 1992) (internal quotation omitted). Persecution refers to "extreme conduct," and "does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." *Majd v. Gonzalez*, 446 F.3d 590, 595 (5th Cir. 2006). So even though persecution can include harms and suffering that are not physical, such as the "imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment or other essentials of life," it requires more than mere discrimination, harassment, or threats. *Eduard v. Ashcroft*, 379 F.3d 182, 187–88 (5th Cir. 2004) (internal quotation omitted).

Here, Matadi has provided evidence that he was approached by the MPLA in 2013, but he declined their invitation to join the party by walking out of the meeting. For the next three years, Matadi was entirely unharmed. Then, in November 2016, Matadi's house was destroyed by government officials, a reprehensible, but not uncommon,[6] occurrence in the country, and Matadi was thrown to the ground and kicked (resulting in a cut on his leg). That same day, Matadi's uncle was beaten and burglarized by unknown assailants who asked

---

pro se petitioners, we find this claim of improper disaggregation unexhausted. We therefore lack jurisdiction to consider it. *See* 8 U.S.C. § 1252(d)(1).

[6] For instance, as the IJ noted, security forces demolished hundreds of allegedly illegal, privately built homes in August 2016, displacing thousands and resulting in several deaths. And, by Matadi's own account, he found "a lot of people crying" at the municipal administrator's officer when he went to report his own home's destruction because their homes, too, had been destroyed.

for Matadi by name. Then, nearly a year later, Matadi was twice approached by a group of men wearing MPLA shirts boasting the power and size of the party and, during at least one of those encounters, robbed. Finally, the landlord for Matadi's church evicted him so that he could rent the space to a store owner; Matadi later learned that the store owner is a member of the MPLA.

While we understand Matadi's concerns about these events, substantial evidence supports the IJ and BIA's findings that these discrete, temporally separated incidents do not amount to a showing of past persecution on the basis of Matadi's political opinions. *See, e.g., Eduard*, 379 F.3d at 187–88 (affirming finding of no persecution where petitioner was struck in the head with a rock and was harassed, taunted, and denigrated); *Abdel-Masieh*, 73 F.3d at 584 (affirming finding of no persecution where petitioner was twice arrested, detained, and beaten—though not severely—by public officials, particularly where petitioner was not singled out for his beliefs); *see also, e.g., Hussain v. Holder*, 567 F. App'x 223, 227 (5th Cir. 2014) (unpublished) (rejecting persecution claim based on a series of "discrete events that occurred over a period of many years"); *Mariena-Moncada v. Holder*, 451 F. App'x 444, 445 (5th Cir. 2011) (unpublished) (affirming finding of no persecution where petitioner experienced verbal threats and one physical attack over a four-to-five-month period).

2

The BIA reasonably determined that Matadi does not have a well-founded fear of future persecution. To demonstrate a well-founded fear of future persecution, a petitioner must establish that his fear is both "subjectively genuine" and "objectively reasonable." *Chen v. Gonzalez*, 470 F.3d 1131, 1135 (5th Cir. 2006) (internal quotation omitted). The IJ did not doubt the subjective genuineness of Matadi's fear. But, to demonstrate its objective reasonableness, Matadi is required to show that: (1) he possesses a protected

belief or characteristic that the persecutor seeks to overcome through punishment; (2) the persecutor knows, or could come to know, he possesses this belief or characteristic; (3) the persecutor is capable of punishing him; and (4) the persecutor has the inclination to punish him. *Id.* at 1135–36 (internal quotation omitted).

Here, the BIA concluded that Matadi failed to provide sufficient evidence to show that the harms he suffered were based on his political opinions and that "there is no evidence that anyone continues to look for him in Angola." Both conclusions, reasonably supported by the record, demonstrate that Matadi has not satisfied the first or fourth prongs required to demonstrate an objectively reasonable fear of returning to Angola. Because Matadi has failed to demonstrate past persecution or a well-founded fear of future persecution, we agree that he is ineligible for a grant of asylum.[7]

## C

In his next argument, Matadi argues that his claim for withholding of removal should be remanded because of the errors in the BIA's asylum decision. However, because we find that the BIA did not err in affirming the IJ's denial of asylum, we likewise find that the BIA did not err in dismissing his request for withholding of removal. *See Mikhael*, 115 F.3d at 306 (observing that, because the standard for withholding of removal is more stringent than the standard for a grant of asylum, courts often summarily dismiss requests for withholding upon finding insufficient evidence for asylum purposes).

---

[7] Matadi also argues that the IJ and BIA erred by improperly shifting the burden to Matadi to prove that he could not relocate to another part of Angola. However, because the BIA reasonably concluded that he did not have a well-founded fear of returning to Angola, irrespective of the city, we need not address this argument. *See* 8 C.F.R. § 208.13(b)(2).

No. 19-60399

D

Finally, Matadi argues that the BIA abused its discretion in denying his motion to reopen. A motion to reopen "shall not be granted" unless the petitioner seeks to introduce evidence that is "material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 1003.2(c). Without addressing the materiality of the proffered evidence, we find that Matadi's argument fails because the evidence was previously available or could have been discovered or presented before the BIA issued its first order.

In support of his motion, Matadi proffered: (1) the 2018 Department of State Human Rights Report and International Religious Freedom Report for Angola; (2) an amended asylum application and personal declaration by Matadi; and (3) an affidavit from Dr. Schubert, an expert in the country conditions in Angola. Only Dr. Schubert's affidavit is at issue on appeal.[8]

Matadi contends that the BIA abused its discretion in concluding that Dr. Schubert's affidavit was previously available to him because Matadi did not previously have counsel and he is in a detention facility where he does not know anyone, he does not speak English, he does not know how to find an expert regarding Angola, and he could not afford to hire an expert even if he located one on his own. Though we recognize, and sympathize with, the practical hinderances that detainees—particularly those without counsel— face, these circumstances do not satisfy the "previously unavailable" requirement.[9] To hold otherwise would be contrary to the Supreme Court's

---

[8] For the first time in his reply brief, Matadi insists that the BIA abused its discretion by failing to consider the materiality of his personal declaration. Matadi abandoned this argument by failing to raise it in his initial briefing. *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994).

[9] At bottom, Matadi was repeatedly informed of his right to obtain counsel and was provided with a list of pro bono attorneys who would have been willing to represent him both

14

No. 19-60399

admonishment that motions to reopen are "disfavored," *INS v. Doherty*, 502 U.S. 314, 323 (1992), and incentivize petitioners to forever claim ignorance of how to procure relevant evidence and delay seeking the advice of counsel—pro bono or otherwise. The BIA's determination that Matadi could have previously obtained Dr. Schubert's expert advice was not capricious, discriminatory, lacking in foundation, or otherwise arbitrary; the BIA therefore did not abuse its discretion in denying Matadi's motion to reopen.

CONCLUSION

For these reasons, Matadi's Petition for Review is DENIED.

---

before the IJ and on appeal to the BIA. However, Matadi declined to exercise the right available to him.